[No. S090730. Aug. 16, 2001.]

RENEE J., Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
ORANGE COUNTY SOCIAL SERVICES AGENCY et al., Real Parties
in Interest.

**COUNSEL**

Carl C. Holmes, Public Defender, Marri Derby and Paul T. DeQuattro, Deputy Public Defenders, for Petitioner.

Bradley A. Bristow for California Public Defenders Association as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

Laurence M. Watson, County Counsel, and Ward Brady, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

Law Offices of Harold LaFlamme, Harold LaFlamme and Craig E. Arthur for Real Party in Interest the Minor.

## OPINION

**WERDEGAR, J.**—This case calls upon us to construe Welfare and Institutions Code section 361.5,[1] which governs orders for reunification services in child dependency proceedings. Pursuant to subdivision (a) of that statute, whenever a child is removed from a parent's or guardian's custody, with certain exceptions not applicable here, the juvenile court shall order the social worker to provide services to the child and the child's parent or guardian. Subdivision (b) of the statute, however, provides that reunification services need not be offered when the court finds, by clear and convincing evidence, that any of a number of conditions exists. Subdivision (b)(10) of section 361.5 provides that services may be denied on a finding "[t]hat (A) the court ordered termination of reunification services for any siblings or half-siblings of the child because the parent or guardian failed to reunify with the sibling or half-sibling after the sibling or half-sibling had been removed from that parent or guardian pursuant to Section 361 and that parent or guardian is the same parent or guardian described in subdivision (a), or (B) the parental rights of a parent or guardian over any sibling or half-sibling of the child had been permanently severed, *and that, according to the findings of the court, this parent or guardian has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half-sibling of that child from that parent or guardian.*" (Italics added.)

 Mother Renee J. was denied reunification services under subdivision (b)(10) of section 361.5. On the facts of this case, the correctness of that ruling hinges on whether the italicized language in the immediately preceding paragraph applies to both subparts (A) and (B), or only the latter. The Courts of Appeal are divided on the question, and the present Court of Appeal joined the court in *Shawn S. v. Superior Court* (1998) 67 Cal.App.4th 1424 [80 Cal.Rptr.2d 80], holding that the language applies to both subparts. (Accord, *In re Diamond H.* (2000) 82 Cal.App.4th 1127 [98 Cal.Rptr.2d 715]; but see *Marshall M. v. Superior Court* (1999) 75 Cal.App.4th 48 [88 Cal.Rptr.2d 891] (*Marshall M.*) [holding "reasonable effort" language applies only to subpart (B)]; *In re Jasmine C.* (1999) 70 Cal.App.4th 71, 76 [82 Cal.Rptr.2d 493] [same]; *In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 475 [73 Cal.Rptr.2d 793] [same]; see also *Marlene M. v. Superior Court* (2000) 80 Cal.App.4th 1139 [96 Cal.Rptr.2d 104] [implicitly concluding same].) Thus, in the absence of the requisite finding, the court granted Renee J.'s petition for extraordinary relief, ordering the juvenile court to vacate its order denying services and directing a new dispositional hearing be held at which services would be offered.

---

[1] Unless otherwise specified, all further statutory references are to the Welfare and Institutions Code.

We find the statute ambiguous in the relevant respect and the canons of construction of little assistance in resolving the question before us. From recent legislative trends toward restricting the circumstances in which reunification services must be provided, however, we discern a legislative intent to deny reunification services to a parent who previously has failed at reunification. We conclude the Court of Appeal erred in its reading of the statute and therefore reverse.

## FACTS AND PROCEDURE

Sayrah R. was born to Renee J. in October 1998. Several of Renee's older children previously had been the subject of dependency proceedings: Anthony R., born in September 1996, Christopher R., born in September 1995, and Dylan J., born in December 1990, had been declared dependents of the Orange County Juvenile Court under section 300, subdivisions (b) and (j) in November 1996, after Anthony was born with a positive toxicology screen for methamphetamine.

Both Renee J. and Robert R., the father of Anthony, Christopher and Sayrah, had long-standing substance abuse problems and an extensive history of domestic violence. In January 1998, after Renee and Robert had received reunification services in the earlier dependency proceeding for 14 months without completing successfully any of the drug programs, testing regimens, parenting classes, housing procurements, domestic violence programs, or visitation schedules that had been prescribed for them by the trial court, the Orange County Juvenile Court terminated reunification services. Later, the court terminated Renee's and Robert's parental rights to Anthony and Christopher, who were in the process of being adopted. Renee's parental rights to Dylan J. were also terminated, and Dylan was in the process of being adopted by Renee's father and stepmother.[2]

According to Renee, when she learned she was pregnant with Sayrah, she began to abstain from drugs and thereafter remained abstinent, although she completed no treatment programs. She acknowledged needing help, such as counseling or a program, in the area of substance abuse. Renee obtained prenatal care throughout the pregnancy, and Sayrah was healthy at birth.

From the time Sayrah was two months to four months old, Renee J. lived with Robert R. At that point, however, she stopped living with Robert and ended the relationship because he became emotionally abusive toward her and she feared he would physically abuse her again, as he had in the past. Thereafter, Renee lived with a friend for a short while and then began living

---

[2]Another sibling, Jesse K., born in July 1993, was living with his father, Brian K.

with her friend Leticia Velez, a former schoolteacher. In lieu of rent, Renee provided child care services for Velez's children. Velez told the social worker she had not been very trusting of Renee at first because she had heard Renee had lost custody of her other children, but Velez began to trust her completely after seeing her consistency in disciplining the children. Velez also said she saw no sign of drug use in Renee during the time she lived with her.

In April 1999, Renee was arrested for burglary and forgery. She was convicted of possessing deceptive government identification, possessing a driver's license to commit forgery, receiving stolen property, second degree burglary and two counts of felony possession of bad checks or money orders. Renee was sentenced to 60 days in jail and 36 months' probation. She did not, however, turn herself in to serve her sentence.[3]

On January 6, 2000, police officers on patrol recognized Renee as a person with outstanding warrants and arrested her. The officers found Sayrah in an improperly secured car seat. In a diaper bag in the car, police found a wallet, personal checks and credit cards that had previously been reported stolen. Renee's picture with an unknown male subject was found inside the wallet, along with the owner's identification. Renee asserted she had found the wallet and notified the owner, but had not had time to return it to her. Police confirmed that the owner of the wallet had received a call from a "Renee," who said she would bring the wallet to the owner's workplace but had never showed up. Renee was eventually sentenced to 150 days in jail on old warrants and probation violations. No new charges were filed in connection with Renee's possession of the reportedly stolen wallet. No drugs or paraphernalia were found in Renee's car.

When Sayrah was taken into protective custody, she was dirty and her diaper had not been changed for several hours, but she appeared healthy and developmentally normal. Because Renee could not provide the name of a relative to take custody of Sayrah, Sayrah was initially placed in a series of temporary homes. Later, Sayrah was moved to the home of her maternal grandfather and stepgrandmother, who, as noted, were in the process of adopting Sayrah's half brother, Dylan. The juvenile court established jurisdiction over the case on February 23, 2000, after finding Sayrah was a

---

[3]Previously, on February 26, 1998, Renee had been sentenced to 30 days in jail for forgery.

At the jurisdictional hearing in this case, Renee acknowledged she had committed the crimes that led to her arrest, explaining she was trying to get money to get herself and Sayrah away from Robert R. She admitted she was aware of the requirement that she turn herself in to serve 60 days, and of the warrant subsequently issued for her arrest. She testified she had planned to turn herself in, but "was trying to get things together to have a secure, safe place for Sayrah to stay."

person described in section 300, subdivisions (b) (failure to protect due to substance abuse), (g) (no provision for support), and (j) (sibling abuse).

At the dispositional hearing on March 14, 2000, the juvenile court found, by clear and convincing evidence, that the reunification services offered to Renee in the cases of Sayrah's two siblings, Anthony and Christopher, and half sibling Dylan had been terminated because both Renee J. and Robert R. had failed to reunify. The juvenile court further found that Renee's parental rights to those children had been terminated and that neither Renee J. nor Robert R. had made a reasonable effort to treat the problems that had led to the removal of Renee's three other children. The court found that, under both subparts (A) and (B) of section 361.5, subdivision (b)(10), reunification services were not appropriate in this case. Although the Orange County Social Services Agency (SSA) specifically eschewed reliance on subdivision (b)(12) of section 361.5, the court nevertheless concluded that subdivision applied, in that Renee had a history of substance abuse. The court further found, by clear and convincing evidence, that the provisions of subdivision (c)(1) and (5) of section 361 applied and that to vest custody of Sayrah with her parents would be detrimental to her. The court then set the matter for a permanency planning hearing pursuant to section 366.26.

Renee petitioned for extraordinary relief pursuant to California Rules of Court, rule 39.1B. The Court of Appeal agreed with her that the juvenile court had erred in resting its decision on subdivision (b)(12) of section 361.5 because SSA had waived reliance on that provision and Renee had relied on the waiver. With respect to section 361.5, subdivision (b)(10), the Court of Appeal likewise found merit in Renee's arguments and, following *Shawn S. v. Superior Court, supra,* 67 Cal.App.4th 1424, read the "reasonable efforts" clause as applicable to both subparts (A) and (B). The Court of Appeal reasoned that abstinence from drugs, regardless of actual completion of a rehabilitation program, would constitute "the most important evidence that a drug problem is being addressed" and concluded that, in the absence of any evidence Renee was still using drugs or had exposed Sayrah to domestic violence, the juvenile court could not simply assume those conditions continued to exist. Having thus rejected both of the juvenile court's stated bases for denying reunification services to Renee, the Court of Appeal granted relief, ordering the juvenile court to vacate its order denying reunification services and setting the matter for a permanency planning hearing, and directing that court instead to hold a new dispositional hearing at which reunification services would be offered.

We granted SSA's petition for review in order to construe section 361.5, subdivision (b)(10). Renee's answer to the petition for review raised, as an

additional issue for our review, the question whether interpreting section 361.5, subdivision (b)(10) to deny her reunification services would deprive her of due process.

## ANALYSIS

" 'A fundamental rule of statutory construction is that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citations.] In construing a statute, our first task is to look to the language of the statute itself. [Citation.] When the language is clear and there is no uncertainty as to the legislative intent, we look no further and simply enforce the statute according to its terms. [Citations.] [¶] Additionally, however, we must consider the [statutory language] in the context of the entire statute [citation] and the statutory scheme of which it is a part. "We are required to give effect to statutes 'according to the usual, ordinary import of the language employed in framing them.' [Citations.]" [Citations.] " 'If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose.' [Citation.] . . . 'When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear.' [Citations.] Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole. [Citations.]" ' " (*Phelps v. Stostad* (1997) 16 Cal.4th 23, 32 [65 Cal.Rptr.2d 360, 939 P.2d 760].)

We are directed to no legislative history expressly answering the question before us and, as a matter of English usage, nothing in section 361.5, subdivision (b)(10) clearly compels one reading over the other. To resolve the ambiguity, the parties cite various principles of statutory interpretation. "A longstanding rule of statutory construction—the 'last antecedent rule'—provides that 'qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more remote.' " (*White v. County of Sacramento* (1982) 31 Cal.3d 676, 680 [183 Cal.Rptr. 520, 646 P.2d 191].) Exceptions to the rule, however, have been identified. One provides that when several words are followed by a clause that applies as much to the first and other words as to the last, " ' "the natural construction of the language demands that the clause be read as applicable to all." ' " (*Wholesale T. Dealers v. National etc. Co.* (1938) 11 Cal.2d 634, 659 [82 P.2d 3, 118 A.L.R. 486].) Another provides that when the sense of the entire act requires that a qualifying word or phrase apply to several preceding words, its application will not be restricted to the last. (*White v. County of Sacramento,*

*supra*, at p. 681.) "This is, of course, but another way of stating the fundamental rule that a court is to construe a statute ' "so as to effectuate the purpose of the law." ' [Citation.] 'Where a statute is theoretically capable of more than one construction [a court must] choose that which most comports with the intent of the Legislature.' [Citation.]" (*Ibid.*, second bracketed insertion in original.) Principles of statutory construction are not rules of independent force, but merely tools to assist courts in discerning legislative intent.

 As the court in *Marshall M.*, *supra*, 75 Cal.App.4th at pages 55-56, observed: "We must . . . give the provision a reasonable and commonsense interpretation consistent with the apparent purpose and intention of the lawmakers, practical rather than technical in nature, which upon application will result in wise policy rather than mischief or absurdity. [Citation.] Significance, if possible, should be attributed to every word, phrase, sentence and part of an act in pursuance of the legislative purpose, as 'the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole.' [Citation.] ' "The court should take into account matters such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy, and contemporaneous construction." ' [Citation.]"

 The purpose of section 361.5 was explained in *In re Baby Boy H.*, *supra*, 63 Cal.App.4th at page 478. "As a general rule, reunification services are offered to parents whose children are removed from their custody in an effort to eliminate the conditions leading to loss of custody and facilitate reunification of parent and child. This furthers the goal of preservation of family, whenever possible. [Citation.] Nevertheless, as evidenced by section 361.5, subdivision (b), the Legislature recognizes that it may be fruitless to provide reunification services under certain circumstances. [Citation.] Once it is determined one of the situations outlined in subdivision (b) applies, the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources. [Citation.]"

 As pertinent, the *In re Baby Boy H.* court went on to infer that the Legislature intended to restrict provision of reunification services in the case of a parent who previously had failed to reunify. "The exception at issue here, section 361.5, subdivision (b)(10), recognizes the problem of recidivism by the parent despite reunification efforts. Before this subdivision applies, the parent must have had at least one chance to reunify with a different child through the aid of governmental resources and fail to do so.

Experience has shown that with certain parents, as is the case here, the risk of recidivism is a very real concern. Therefore, when another child of that same parent is adjudged a dependent child, it is not unreasonable to assume reunification efforts will be unsuccessful. Further, the court may still order reunification services be provided if the court finds, by clear and convincing evidence, that reunification is in the best interests of the child. (§ 361.5, subd. (c).)" (*In re Baby Boy H.*, *supra*, 63 Cal.App.4th at p. 478.)

 We agree with *In re Baby Boy H.*'s understanding of the legislative purpose in enacting section 361.5, subdivision (b)(10) and with its interpretation of the statute. Renee cites factual differences between that case and this one, but any such differences are irrelevant to the pure question of statutory interpretation confronting us here. At the same time that it enacted subdivision (b)(10), moreover, the Legislature shortened from 12 months to six the period for provision of reunification services in the case of a child who was under age three at the time of removal from the physical custody of the parent. (§ 361.5, subd. (a)(2), added by Stats. 1996, ch. 1083, § 2.7.) One might thus characterize both of these amendments as aimed at expediting the dependency process in order to facilitate the placement of minors in stable, permanent homes, particularly in the cases of the youngest children and those least likely to benefit from reunification services. Consistent with this aim, we find it probable that the Legislature did not intend, in the case of a minor whose parent in connection with a prior dependency proceeding has already demonstrated an inability to benefit from services, to impose for denial of services an additional and arguably redundant requirement that the parent has made no reasonable effort to treat the underlying problem.

As the *Marshall M.* Court of Appeal reasoned (*supra*, 75 Cal.App.4th at p. 55), our reading of the statute accords significance to all its parts. Had the Legislature intended to require the finding of no reasonable effort in the case both of the parent whose service plan had been ordered terminated and of the parent whose rights over the child had been severed, there would have been no need to affix separate (A) and (B) labels to the two clauses. (Cf. *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1117 [81 Cal.Rptr.2d 471, 969 P.2d 564] [separately numbered paragraphing as emphasizing grammatical and analytical independence of clauses within Code Civ. Proc., § 425.16, subd. (e)].) Likewise, had the Legislature meant to require the no-reasonable-effort finding in both cases, it might have set forth that requirement as a preface to the two different scenarios. The Legislature, however, did neither.

Moreover, when viewed in the context of the different ways in which a child is removed from his or her parents, the distinction between subparts

(A) and (B) of section 361.5, subdivision (b)(10) is a reasonable one. As the court in *Marshall M., supra*, 75 Cal.App.4th at page 56, observed, "Subparts (A) and (B) . . . are similar in that each involve[s] a court's prior removal of another child of the parent . . . ." But, as the court explained, "there is also a key distinction between the two subparts. This distinction relates to whether the parent has previously failed when given a chance at reunification services." (*Ibid.*) Thus, under subpart (A), "the parent had an opportunity to reunify and failed. Therefore, the court selected a permanent plan for the sibling. In other words, in the case of subdivision (b)(10)(A), the parent did not make a reasonable effort to treat the problems that led to the sibling's removal because that parent necessarily failed to reunify. [¶] Section 361.5, subdivision (b)(10)(B) anticipates a discrete scenario. Subpart (B) requires a termination of rights but does not condition the termination upon a parent's failure to reunify. Indeed, the fact that the parent's rights over any sibling have been permanently severed . . . does not inescapably establish that the parent failed to make a reasonable effort to treat the problems that led to the sibling's removal. . . . [¶] . . . [I]n a case described by . . . subpart (A), the court knows as a matter of law that the parent did not make reasonable efforts to treat the problems that led to the sibling's removal. The same cannot be said solely because a parent's rights over another child have been permanently severed."[4] (*Marshall M., supra*, at pp. 56-57.)

As SSA observes, the legislative history of section 361.5, subdivision (b)(10) reveals that subparts (A) and (B) were originally drafted as

---

[4]SSA offers specific examples illuminating the difference between subparts (A) and (B) of Welfare and Institutions Code section 361.5, subdivision (b)(10). Whereas subpart (A) addresses dependent children whose parents have received reunification services, SSA posits, subpart (B) embraces children whose parents may not have received services. SSA observes that parental rights may be terminated outside the dependency system without provision of services, pursuant to the Family Code, by one parent against another in order to free a child from the burden of an absent or ineffective parent's custody rights, or to free a child for adoption. Thus, under Family Code section 7820, a parent or even a third party could bring an action to sever a parent's rights in the case of abandonment (Fam. Code, § 7822), neglect (*id.*, § 7823), the respondent parent's disability due to substance abuse (*id.*, § 7824), the respondent parent's conviction of a felony (*id.*, § 7825), the respondent parent's developmental disability or mental illness (*id.*, § 7826), or the child's being in an out-of-home placement for a one-year period (*id.*, § 7828). Parental rights also would be severed without provision of services in the case of a parent who voluntarily relinquishes his or her child to a public or private adoption agency pursuant to Family Code section 8700. Thus, for example, a mother who, as a young girl, had relinquished a child for adoption due to her inability to support the child and, years later, becomes involved in the dependency system with a subsequent child, might, under Welfare and Institutions Code section 361.5, subdivision (b)(10), subpart (B), argue that she had made a reasonable effort to improve her financial circumstances (i.e., she had treated the problem that led to the removal of the first child) and would benefit from reunification services. We agree with SSA that the Legislature reasonably could conclude that under these scenarios reunification services should be provided, in contrast to the case of a parent who previously had failed to reunify despite the provision of services.

separately numbered paragraphs and were only combined in the shaping of the final form of the amendment to section 361.5. (See Legis. Counsel's Dig., Assem. Bill No. 2679 (1995-1996 Reg. Sess.) as amended Feb. 22, 1996; Assem. Com. on Judiciary, Analysis of Assem. Bill No. 2679 (1995-1996 Reg. Sess.) as amended Apr. 18, 1996; Sen. Rules Com., Office of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2679 (1995-1996 Reg. Sess.) as amended Aug. 22, 1996.) Of the two, only the provision that is now subpart (B) ever included the requirement of the no-reasonable-effort finding. Although the significance of this sequence of events is not free from doubt, we find it reasonable to infer that, in combining into one subdivision the two provisions that are now subparts (A) and (B), respectively, the Legislature meant to group together two thematically related scenarios (i.e., two distinct kinds of court-ordered removal of a child from a parent), while still applying different requirements to each.

The parties devote much of their remaining argument to an examination of technical aspects of the wording and punctuation of the statute, matters that we find less significant than its legislative history and evident purpose, as discussed above.

First, Renee argues that because both subpart (A) and subpart (B) of section 361.5, subdivision (b)(10) refer to a "sibling or half-sibling," and the "reasonable effort" clause also refers to a "sibling or half-sibling," the principle in *Wholesale T. Dealers v. National etc. Co.*, *supra*, 11 Cal.2d at page 659, dictates that the latter clause refers to both subparts. Undercutting this argument, however, is the fact that—as Renee acknowledges—both subpart (A) and the "reasonable effort" clause, but not subpart (B), refer to a "removed" sibling. Obviously, the "reasonable effort" clause must apply, at a minimum, to subpart (B). The repetition (or absence) of certain words or phrases within the various parts of section 361.5, subdivision (b)(10), therefore, does not dictate the interpretation Renee urges.

Citing *Board of Trustees v. Judge* (1975) 50 Cal.App.3d 920, 927-928, footnote 4 [123 Cal.Rptr. 830], Renee further argues that the Legislature's use of a comma to separate the "reasonable effort" phrase from the antecedent phrases signifies it intended the phrase to apply to all antecedents rather than only the last. She also observes that the Legislature, after the enactment of section 361.5, subdivision (b)(10) but before its effective date, amended the statute to add that comma (Stats. 1997, ch. 793, § 18), the initial version of the statute not having included it (Stats. 1996, ch. 1083, § 2.7). We agree generally that the presence or absence of commas is a factor to be considered in interpreting a statute (see *Board of Trustees v. Judge, supra*, at p. 928, fn.

4), but find this principle not to be dispositive in the present case. Inasmuch as a comma properly joins the independent clauses of subpart (B) regardless of the existence of subpart (A), the inference that, by so amending the statute, the Legislature meant the "reasonable effort" clause to apply to both subparts arises only weakly, if at all, and the history of the provision, as discussed above, tends to refute it.[5]

Pointing out that courts are to avoid interpretations that render some words surplusage (*Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224]), Renee contends SSA's interpretation of section 361.5, subdivision (b)(10) runs afoul of this principle. She reasons that SSA justifies its discrepant treatment of the parent who previously has failed at reunification with other siblings (i.e., facts triggering the application of subpart (A)), vis-à-vis the parent whose rights over another sibling had been permanently severed (i.e., facts triggering the application of subpart (B)), by equating the parental failure to complete a prior service plan, leading to a court-ordered termination of services (subpart (A)), with the failure to make a reasonable effort to treat the problems that led to the removal of the sibling. But the statute, according to Renee, contemplates that such effort be made "subsequently" to the court order, an impossibility under SSA's reading, inasmuch as the failure to complete the reunification plan necessarily *precedes* the court's order terminating services. Renee's argument, however, commits the fallacy of assuming its conclusion, i.e., only if one accepts the premise that the reasonable effort clause applies to subpart (A) does the referent for "subsequently" become an issue. But even were we to accept that premise, we disagree that the efforts must be made subsequent to the *termination* order. Rather, the statute by its terms refers to efforts subsequently made to treat the problem that led to *removal* of the child from the parents, which removal, in the case of subpart (A) cases, occurs before services are provided or terminated. (See *Marshall M., supra,* 75 Cal.App.4th at p. 57.)

In sum, we interpret the no-reasonable-effort clause as applicable only to subpart (B) of section 361.5, subdivision (b)(10).[6] If we have failed to

---

[5]Of somewhat greater force, as a matter of grammatical interpretation, is the fact the "reasonable effort" clause refers to "*this* parent or guardian" (italics added); as SSA observes, the demonstrative pronoun "this" ordinarily is understood to refer to the nearer of two or more things or persons, hence in this context it arguably would relate to the parent or guardian described in subpart (B) of section 361.5, subdivision (b)(10).

[6]*Shawn S. v. Superior Court, supra,* 67 Cal.App.4th 1424, and *In re Diamond H., supra,* 82 Cal.App.4th 1127, are disapproved to the extent they are inconsistent with our decision in this case.

discern correctly the Legislature's intent in enacting the statute, that body may clarify the statute accordingly.[7]

Renee contends the interpretation of section 361.5, subdivision (b)(10) that we embrace in this case violates due process. Her argument is twofold: Procedural due process is denied by the statute's failure to place the burden on SSA to demonstrate the parent's unworthiness to receive reunification services, and substantive due process is violated by its exclusive reliance on the parent's problematic history and corresponding failure to require proof of the parent's *current* unfitness. We address each contention in turn.

For her procedural due process claim, Renee relies on *Santosky v. Kramer* (1982) 455 U.S. 745 [102 S.Ct. 1388, 71 L.Ed.2d 599] (*Santosky*), in which the United States Supreme Court held unconstitutional a New York statute permitting termination of parental rights based on a finding of permanent neglect made by a mere preponderance of the evidence. Because of the fundamental nature of the rights at stake and the irreparable harm an erroneous decision to terminate them would cause, as compared with the lesser societal costs of an erroneous decision to postpone their termination, the high court determined that the federal Constitution imposes a heightened standard, that of clear and convincing evidence. (*Santosky*, *supra*, at p. 769 [102 S.Ct. at p. 1403].)

Renee also distinguishes *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242 [19 Cal.Rptr.2d 698, 851 P.2d 1307] (*Cynthia D.*), in which this court rejected a parent's argument that California's child dependency scheme violates due process by allowing termination of parental rights based on a finding by a mere preponderance of the evidence that return of the child to parental custody would create a substantial risk of detriment to the child. In *Cynthia D.*, we held that, in the context of the entire process for terminating parental rights under the dependency statutes, the proof requirements at the selection and implementation hearing held pursuant to section 366.26 comport with due process "because the precise and demanding substantive and procedural requirements the petitioning agency must have satisfied before it

---

[7]California Rules of Court, rule 1456(f)(5), we note, is inconsistent with the interpretation of section 361.5, subdivision (b)(10) endorsed here. As relevant, the rule provides: "Reunification services need not be provided to a mother, statutorily presumed father, or guardian, if the court finds, by clear and convincing evidence, any of the following: [¶] . . . [¶] (J) The court: [¶] (i) has terminated reunification services for a sibling or half-sibling of the child because the parent failed to reunify with the sibling or half-sibling, or finds that the parental rights of the parent over any sibling or half-sibling have been terminated; and [¶] (ii) finds that the parent or guardian has not made a reasonable effort to treat the problems that led to the removal of the sibling or half-sibling from that parent or guardian." The rule, as is evident, "does not track the language of section 361.5, subdivision (b)(10)." (*Marshall M.*, *supra*, 75 Cal.App.4th at p. 59.)

can propose termination are carefully calculated to constrain judicial discretion, diminish the risk of erroneous findings of parental inadequacy and detriment to the child, and otherwise protect the legitimate interests of the parents. At this late stage in the process the evidence of detriment is already so clear and convincing that more cannot be required without prejudice to the interests of the adoptable child, with which the state must now align itself." (*Cynthia D., supra,* at p. 256.)

At issue in both *Santosky* and *Cynthia D.* was the quantum of proof required for termination of parental rights, which indisputably are fundamental in nature. (*Santosky, supra,* 455 U.S. at pp. 758-759, 769 [102 S.Ct. at pp. 1397-1398, 1403].) Here, in contrast, Renee's parental rights have not been terminated. Renee assumes, but fails to establish, the foundational premise that she possesses a constitutionally protected liberty interest in the state's providing her with reunification services. The Courts of Appeal that have addressed this question have held to the contrary. (*In re Baby Boy H., supra,* 63 Cal.App.4th at p. 475; *In re Christina A.* (1989) 213 Cal.App.3d 1073, 1078-1079 [261 Cal.Rptr. 903].) Although Renee may be understood to argue that reunification services constitute her only opportunity to reunify with Sayrah, and thus that a denial of services is tantamount to a slow termination of her rights, in our view the present state of the record does not enable this court to draw such a conclusion. For example, a petition pursuant to section 388 remains an available mechanism by which to modify the juvenile court's previous orders, given some sufficiently compelling new evidence or change of circumstances.

In any event, as SSA points out, even in the face of a finding under section 361.5, subdivision (b)(10), the juvenile court may still order reunification services if it finds, by clear and convincing evidence, that reunification is in the best interest of the child. (§ 361.5, subd. (c).) Thus, contrary to Renee's and amicus curiae California Public Defenders Association's substantive due process argument, evidence of a parent's current fitness may, in appropriate circumstances, persuade the juvenile court to order reunification services despite his or her problematic history.[8]

We are satisfied that, given the weighty interests of the state in assuring the proper care and safety of children in the dependency system, and those of

---

[8]Amicus curiae contends the existence of subdivision (c)'s "bailout" provision cannot save section 361.5 from a due process challenge because, unlike the parental rights termination at issue in *Cynthia D., supra,* 5 Cal.4th 242, the determination to withhold reunification services comes near the inception of the dependency case, before the state has borne the burden of repeatedly demonstrating parental unfitness at the various hearings required at specified stages of the proceedings. Our analysis of the *Santosky* factors, however, leads us to conclude section 361.5, subdivision (b)(10) is constitutionally valid as we have interpreted it. First, considering the private interest affected (*Santosky, supra,* 455 U.S. at p. 759 [102 S.Ct. at pp. 1397-1398]; *Cynthia D., supra,* at p. 254), we observe again that at the stage of the

the children themselves, this provision sufficiently diminishes the risk of erroneous deprivations of services as to satisfy the requirements of due process. (See *Cynthia D., supra*, 5 Cal.4th at pp. 250-256.)

## DISPOSITION

The judgment of the Court of Appeal is reversed.

George, C. J., Baxter, J., Chin, J., and Brown, J., concurred.

**KENNARD, J.,** Dissenting.—When a child is removed from a parent's custody as part of a dependency proceeding (Welf. & Inst. Code, § 300),[1] the juvenile court must normally order the social services agency to provide reunification services to the child and the parent. Without such services, a parent whose child has been removed has little hope of ever regaining custody of the child.

But reunification services need not be provided in certain instances specified by statute. Subdivision (b)(10) of section 361.5 (section 361.5(b)(10)) describes two such instances: When past efforts at reunification proved unsuccessful after removal of another child, and when parental rights to another child have been severed. A clause at the end of section 361.5(b)(10) states that reunification services must nonetheless be afforded if the parent has made a "reasonable effort" to treat the problems that led to the other child's removal. At issue here is whether this clause (the reasonable effort clause) applies only when parental rights to the other child were severed, or whether it also applies when reunification services were unsuccessfully provided after removal of the other child.

The majority concludes that the reasonable effort clause applies only when parental rights were severed. I disagree.

proceedings with which we are concerned, the juvenile court has already found jurisdiction over the child (see § 300), but has not yet reached the point at which a decision to terminate parental rights is to be made. The parent's interest, therefore, while significant, is of a somewhat lesser order than in the decisions on which Renee and amicus curiae rely. Second, the risk of erroneous factfinding (*Santosky, supra*, at p. 762 [102 S.Ct. at p. 1399]; *Cynthia D., supra*, at pp. 254-255) is mitigated by the parent's right to counsel (§ 317, subd. (d)) and access to relevant records maintained by state or local public agencies, hospitals, medical or nonmedical practitioners, and child care custodians (§ 317, subd. (f)). Third, the governmental interest supporting the statutory procedure (*Santosky, supra*, at p. 766 [102 S.Ct. at pp. 1401-1402]; *Cynthia D., supra*, at pp. 255-256)—"the state's *parens patriae* interest in preserving and promoting the welfare of the child, and the state's fiscal and administrative interest in reducing the cost and burden of such proceedings" (*Cynthia D., supra*, at p. 255)—is substantial.

[1]Unless otherwise stated, all statutory references are to the Welfare and Institutions Code.

## I. Facts

Petitioner Renee J. and her boyfriend Robert R. had a long history of drug use and domestic violence. As a result, the Orange County Social Services Agency (SSA) removed their children, Anthony and Christopher, and Renee's daughter Dylan. After reunification services proved unsuccessful, the superior court terminated the parental rights of Renee and Robert as to those three children.

Thereafter Renee and Robert had Sayrah R., the subject of this proceeding, who was born in October 1998. According to Renee, she stopped using drugs when she was pregnant with Sayrah; when Sayrah was four months old, Renee broke up with Robert, taking Sayrah with her. Two months later she was charged and convicted of burglary and forgery. Sentenced to 60 days in jail, she failed to turn herself in to serve her sentence, and a bench warrant was issued for her arrest. When arrested on that warrant in January 2000, she was driving a car. Sayrah was in a child safety seat that lacked the required base and was not properly attached. Renee told police she was a transient, and she could not name a responsible adult who would care for Sayrah during incarceration.

SSA filed a petition asking the superior court to declare Sayrah a dependent child. The petition alleged that Renee's negligence in the matter of the safety seat showed a lack of concern for Sayrah's safety; that Renee was unable to care for Sayrah because of her history of drug abuse, her criminal history, her incarceration on the bench warrant, and her lack of a permanent residence; and that Renee had abused or neglected Sayrah's siblings and there was a substantial risk she would abuse or neglect Sayrah. The superior court found the allegations of the petition true.

At the time of the dispositional hearing, Renee was separated from Robert (who had apparently left the state), and there was no evidence that she had resumed using drugs. SSA argued that under section 361.5(b)(10), it need not provide reunification services to Renee because it had afforded them without success after removal of Renee's other children. The superior court construed section 361.5(b)(10) as entitling Renee to reunification services if she had made a reasonable effort to treat the problems that led to the removal of her other children, but it ruled that she had not made such an effort. It therefore refused to order reunification services.

Renee filed a petition for writ of mandate in the Court of Appeal to challenge the superior court's ruling. The Court of Appeal agreed with the superior court that Renee was entitled to reunification services if she had

made a reasonable effort to treat her problems, but it held that the superior court had abused its discretion when it ruled that Renee had not made such an effort. We granted review, limited to the question of whether a parent who made a reasonable effort to treat the problems that led to the previous removal of a child or children may obtain reunification services when another child is later removed in a dependency proceeding.

## II. The Statutory Scheme

Subdivision (a) of section 361.5 sets forth the general rule that a parent whose child has been removed in a dependency proceeding must be afforded reunification services. Subdivision (b) of that section lists the relatively extreme or unusual circumstances in which reunification services are not required. These circumstances include death of a sibling from abuse or neglect, severe sexual abuse or physical harm, repeated physical or sexual abuse, parental conviction of a violent felony, and willful abduction of the child from placement by the parent.

At issue here are the circumstances described in section 361.5(b)(10). That provision states that reunification services need not be afforded if the superior court finds: "That (A) the court ordered termination of reunification services for any siblings or half-siblings of the child because the parent or guardian failed to reunify with the sibling or half-sibling after the sibling or half-sibling had been removed from that parent or guardian pursuant to Section 361 and that parent or guardian is the same parent or guardian described in subdivision (a), or (B) the parental rights of a parent or guardian over any sibling or half-sibling of the child had been permanently severed, *and that, according to the findings of the court, this parent or guardian has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half-sibling of that child from that parent or guardian.*" (Italics added.) The superior court and the Court of Appeal here concluded that the reasonable effort clause, italicized above, applies to both subparts of section 361.5(b)(10). SSA argues that it applies only to subpart (B).

Ordinarily, the removal of a child in the course of dependency proceedings would require reunification services. Thus, subpart (A) of section 361.5(b)(10) applies to *most* parents whose children were removed in dependency proceedings. Subpart (B), however, applies if reunification services for the sibling in a dependency proceeding were denied because of circumstances described in subdivision (b) of section 361.5, which we described earlier. Subpart (B) also applies when parental rights are severed outside of the dependency system. This occurs when a child has been abandoned or

voluntarily relinquished for adoption, or when a third party brings an action to sever parental rights after the parent has been convicted of a felony or is seriously mentally ill. (Fam. Code, § 7800 et seq.)

## III. DISCUSSION

At issue here is how to construe section 361.5(b)(10). In performing that task, we are guided by these principles: "The aim of statutory construction is to discern and give effect to the legislative intent. (*Phelps* v. *Stostad* (1997) 16 Cal.4th 23, 32 [65 Cal.Rptr.2d 360, 939 P.2d 760].) The first step is to examine the statute's words because they are generally the most reliable indicator of legislative intent." (*Summers v. Newman* (1999) 20 Cal.4th 1021, 1026 [86 Cal.Rptr.2d 303, 978 P.2d 1225].) I therefore begin with the language of section 361.5(b)(10).

The majority insists that, "as a matter of English usage," nothing in the words of section 361.5(b)(10) indicates whether the Legislature intended the section's reasonable effort clause to apply only to subpart (B) of that section, or to subparts (A) *and* (B). (Maj. opn., *ante*, at p. 743.) I disagree. As I shall explain, when the words of section 361.5(b)(10) are given their "usual and ordinary meaning" (*DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140]), the reasonable effort clause at issue here logically applies to both subparts of that section.

Section 361.5(b)(10), as discussed earlier, does not require reunification services if the superior court finds: "*That* (A) the court ordered termination of reunification services for any siblings or half-siblings of the child because the parent . . . failed to reunify . . . after the sibling or half-sibling had been removed . . . or (B) the parental rights of a parent . . . over any sibling or half-sibling of the child had been permanently severed, *and that,* according to the findings of the court, this parent . . . has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half-sibling of that child from that parent . . . ." (Italics added.) As a matter of syntax, the second italicized "that" in that passage, which prefaces the reasonable effort clause, logically pairs with the first italicized "that" at the beginning of the section. Therefore, the reasonable effort clause after the second "that" necessarily applies to the entire section, not merely to subpart (B). Had the Legislature intended the reasonable effort clause to apply only to subpart (B), it could easily have omitted the second italicized "that."

Furthermore, in the reasonable effort clause the Legislature uses the phrase "the problems that led to *removal* . . ." (italics added), which suggests that the clause applies to both subparts (A) and (B). As previously

explained (see pt. II, *ante*), some parents fall under the provisions of subpart (B) (termination of parental rights to a sibling of the child without reunification services) not because the sibling was *removed*, but because the parents abandoned the sibling or voluntarily gave the sibling up for adoption. If anything, the word "removal" appears to refer to subpart (A), which uses the word "removed." Had the Legislature intended the reasonable effort clause to refer only to subpart (B), it would most likely have said "the problems that led to *termination of parental rights*," rather than "the problems that led to *removal*," as currently stated in the statute.

Aside from the statutory language, an examination of the policy concerns underlying the Legislature's decision to include the reasonable effort clause in section 361.5(b)(10) shows that it intended the clause to apply to both subparts of that provision. The purpose of the clause is to give a parent who has made a reasonable effort to deal with the problems that led to removal of one child a chance at reunification when a second child is removed. For example, if one child is removed because the parent is addicted to drugs, and the parent later gives up drugs but another child is thereafter removed because the parent has an abusive partner, the parent should, in the Legislature's view, be given a chance to reunify with the second removed child.

This policy applies equally to parents in subpart (A) (parents for whom previous reunification services were unsuccessful) as it does to parents in subpart (B) (parents whose parental rights were severed). As I have explained (see pt. II, *ante*), included in subpart (B) are parents who never received reunification services before losing custody of a child in an earlier proceeding because their treatment of that child was so bad that it fell within one of the statutorily described circumstances in which the court could deny reunification services. (See § 361.5, subd. (b).) I can think of no reason why the Legislature would have chosen to give such parents a chance at reunification when a second child became a dependent of the juvenile court, while denying that opportunity to parents who were unsuccessful in reunifying with a previously removed child. Yet that is the effect of the majority's holding today.

One more point. This court generally construes laws in a manner that avoids doubts about their constitutionality. (See, e.g., *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 509 [53 Cal.Rptr.2d 789, 917 P.2d 628].) This rule also applies when one of two possible constructions of a statute raises doubts about the constitutionality of another part of the statutory scheme. That is the case here. The majority's construction of the reasonable effort clause raises doubts about the constitutionality of another part of the Legislature's statutory scheme for the severance of parental rights to dependent children, as I explain below.

Under California's statutory scheme, parental rights may be permanently severed when a superior court finds by a *preponderance of the evidence* that returning the child to the parent's custody would create a substantial risk of detriment to the child. (See §§ 366.21, subd. (e), 366.22, subd. (a), 366.26, subd. (c)(1).) In *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242 [19 Cal.Rptr.2d 698, 851 P.2d 1307], a majority of this court rejected a due process challenge to that standard. As part of the basis for its decision, the majority noted that before a final determination by the superior court whether to sever a parental relationship, "there have been a *series of hearings involving ongoing reunification efforts* and, at each hearing, there was a statutory presumption that the child should be returned to the custody of the parent." (*Id.* at p. 253, italics added.) I dissented in *Cynthia D.*, reasoning that "the basic requirements of procedural due process do not allow the state to terminate parental rights in such a proceeding without clear and convincing evidence of a substantial risk of detriment to the child." (*Id.* at p. 257 (dis. opn. of Kennard, J.).)

Under the majority's decision today, a parent who, after failing to reunify with one removed child, makes a reasonable effort to treat the problems that caused that child's removal but then suffers the removal of a second child, may not, as to the second child, receive the "series of hearings involving ongoing reunification efforts" that the majority in *Cynthia D. v. Superior Court, supra,* 5 Cal.4th at page 253, relied on in upholding the constitutionality of the "preponderance of evidence" standard established by the statutory scheme. Thus, the majority's holding here weakens the underpinnings of *Cynthia D.*, and it raises doubts about the constitutionality of the preponderance of evidence standard that the *Cynthia D.* majority upheld. To avoid those constitutional issues, I would construe the reasonable effort clause broadly, applying it to all parents in section 361.5(b)(10).

Here, the Court of Appeal agreed with the superior court that the reasonable effort clause applied to Renee, but it disagreed with the superior court's finding that she was not entitled to reunification services with Sayrah because she had not made a reasonable effort to treat the problems that had led to the removal of her other children. Were the issue properly before this court, I might well find that the evidence supports the superior court's ruling that Renee did not make a reasonable effort to deal with her problems. But that issue is not before us. In its petition for review, SSA did not challenge the Court of Appeal's conclusion that Renee had made reasonable efforts to treat her problems; instead, it asserted that the reasonable effort clause was inapplicable. Therefore, I would affirm the judgment of the Court of Appeal,

which applied the reasonable effort clause in reversing the superior court's ruling that Renee was not entitled to reunification services with reference to Sayrah.