[No. G039351. Fourth Dist., Div. Three. May 14, 2008.]

In re WILLIAM B. et al., Persons Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and
Appellant, v.
RICHARD B., Defendant and Appellant;
C.C., Defendant and Respondent;
WILLIAM B., a Minor, etc., et al., Appellants.

## Counsel

Benjamin P. de Mayo, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Appellant.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant Richard B.

Linda Rehm, under appointment by the Court of Appeal, for Defendant and Respondent C.C.

Leslie A. Barry, under appointment by the Court of Appeal, for Minors and Appellants, William B. and Noah B.

OPINION

**SILLS, P. J.**—Nine-year-old William and five-year-old Noah were removed from their parents' custody for the third time in March 2007. Because the previous dependency proceedings had been terminated, the Orange County Social Services Agency (SSA) filed a new petition based on the children's abuse and neglect due to the parents' long-standing drug use and recommended denying the parents reunification services. The juvenile court denied services to the father, but, notwithstanding the "staggering amount" of services previously offered to the mother, it gave her "one more chance" and ordered services.

Three times is enough. The juvenile court improperly focused on the children's love for their mother rather than any realistic chance they would find permanency and stability with her. We find the order providing services to the mother was an abuse of discretion and reverse it. We affirm the order denying services to the father.

## FACTS

C.C. and Richard B., parents of William and Noah, met in a recovery home in 1996. Both have a long history of drug and alcohol abuse. The mother was previously married to Bill S., with whom she had two daughters, Melissa and Megan. They divorced in 1994, and the girls initially remained with the mother. Subsequently, the girls were removed from the mother's custody and declared dependents of the juvenile court due to her drunkenness and child endangerment. The girls were released to their father, and their dependency was terminated a year later.

William and Noah were first removed from their parents in November 2001 when Noah was born with a positive toxicology screen for methamphetamine. They were placed with Laurie and Dan J. in February 2002. After eight months of reunification services, the boys were returned to their parents' care under a plan of family maintenance in August 2002. The family struggled with housing and employment, and the mother continued to resist drug abuse treatment. In June 2003, the mother was arrested for drug use and possession of paraphernalia and for failure to use child safety seats. The juvenile court ordered the mother to live apart from the rest of the family and the boys were placed with the father with continued family maintenance services.

This situation continued for almost a year. Then, in May 2004, the parents were arrested for burglary. Together in violation of the court order, the mother had been using drugs and the father had been abusing alcohol. The juvenile

court sustained a supplemental petition, removed the boys from parental custody, and provided further reunification services to the parents. The boys were again placed in the home of Laurie and Dan J., who expressed an interest in adopting them if necessary. They remained there for almost 18 months, while the parents made steady progress on their case plans. In January 2006, the juvenile court placed the boys back in the parents' custody with family maintenance services; in August 2006, the court terminated dependency proceedings.

Six months later, the parents were arrested for being under the influence of drugs and having drugs and paraphernalia within reach of the children. The parents were incarcerated, and the children were taken in by their maternal grandparents. The maternal grandparents were unable to care for the children on a long-term basis, however, so SSA detained them in March 2007 and again placed them with Dan and Laurie J.

The mother admitted she and the father started using drugs again sometime between November 2006 and January 2007. She stated she was aware that her drug and alcohol addiction was an illness. William told the social worker he "knew about 'alcohol, crystal meth, meth and pot.'" He was able to describe his father "doing drugs" with a glass pipe and a lighter. "'They either use a match, a lighter or sometimes the stove.'" Both children reported many strange people coming in and out of their home, sometimes living there for awhile. Both children also reported domestic violence between the mother and the father. They were both afraid of the father, and William's first priority was to get his father out of his life. William stated, "'I protect mom and Noah[,] that's my job.'"

SSA filed a new petition alleging neglect, abandonment, and sibling abuse. Social worker Valerie Butler recommended the denial of reunification services based on the parents' failed substance abuse treatment history. Butler noted since 1994, the mother had made six attempts at sobriety by enrolling in treatment programs. The father had completed three drug treatment programs since 2001, "but failed to practice his 12-step[]s with[]out direct supervision[,] leading to his relapse."

The jurisdiction and disposition hearing was continued repeatedly until July 2007. The court heard testimony from the parents and Butler; on August 9, it sustained the petition and declared the children to be dependents of the court. The disposition phase began a few days later with William and Noah's testimony in chambers. William, who was almost 10 at that time, testified things were good when he and Noah were returned to the parents a year ago, "[b]ut things just got worse and worse and worse until the day my grandparents picked me up and told me what happened." He described how his

parents became lazier and lazier, often sleeping in and forgetting to wake him up for school and church. His mother stopped cooking and doing laundry. Groups of people came in and out of the house, sometimes fighting and yelling. The father often got angry. Once, he pulled the mother's hair and knocked her down. Another time, the father hit a cupboard door so hard it fell off its hinges and struck William on the back and shoulders, hurting him.

William liked living with Dan and Laurie. There were "lots of fun animals to play with," and he liked the country better than the city. When asked if he would want to live with his parents again, he feared it would be "like an out-of-order candy dispenser." He explained that living at home was "just out of order. Nothing worked." He wanted to stay living with Dan and Laurie for "right now," but he did not know whether he wanted to stay there. "It's just that my real parents, they're my real parents; and [Dan and Laurie], I've been with them awhile, and it's not out of order like it is at my parents' house." Dan and Laurie took him to school and church on time, made sure he had clean clothes, food and water, and made him feel comfortable and safe.

William told the court he loved his mom and loved to see her, but he repeatedly stopped short of saying he wanted to live with her. "I told you, I don't know because I'm just afraid that things will go out of order." If his father were out of the picture, "things wouldn't be as out of order. Things would be better. [But] I still don't know if my mom would do good." The mother's counsel asked, "[W]ould you want to live with your mom if she was in a house [rather than an apartment] with a garden and arena and stars and fresh air [like where Dan and Laurie lived]?" William answered, "I told you I do not know because I'm just afraid of things to go back to the same way."

Noah was five years nine months old at the time of his testimony. He agreed that he liked living at Laurie and Dan's, he felt safe there and wanted to stay living there "for now." When asked if he remembered living with his parents, he stated, "I don't want to talk about it" because it was "scary." He explained some of the scary things: William told him about the incident when the father pulled the mother's hair and knocked her down. William also told him his father took drugs in the glass pipe. Noah was present when William got hit with the cupboard door; he described his father getting so angry "that he slapped the cupboard door . . . , and it got [William]." The two boys and the mother went "into our mom's room" because "that's where it's most safe." Noah said he saw his father hit his mother on at least one occasion. "My dad was getting all stressed out, then he smacked [the mother]." Noah described his dad as "really, really mean" and "evil" and attributed all their problems to him. He said he hated his father and did not want to see him. Noah testified he loved his mom and liked to have visits with her. He agreed he would like to live with her and William, but not with the father.

The juvenile court found by clear and convincing evidence that both parents had a history of chronic drug use and had resisted court-ordered treatment for the problem during the three-year period preceding the filing of the petition. It then considered whether there was clear and convincing evidence that offering reunification services to the parents would be in the best interests of the children. The court pointed out that the boys were afraid of the father and there was no bonding with him. It found it was not in their best interests to offer him reunification services and ordered no visits between the father and the children.

The court did not want to terminate services to the mother, however, because the boys had both testified they loved her and wanted to be with her. Although the court stated there was clear and convincing evidence that offering services to the mother was in the boys' best interests, the court expressed its doubts about the mother's chances for success. "She's got many, many problems. I don't know if she's going to ever resolve that drug or alcohol issue. I don't know." It continued, "I believe at this time it's still too early to terminate services for the mother. There's a chance by clear and convincing evidence. [¶] It's not based on you, Ms. C[.] It's based on the little boys. I'm going to give them another chance. . . . I think it's a close issue. But I think by clear and convincing evidence, I'm convinced that we're going to give you one more chance for those services. I don't know what's going to happen. The past history's going to show that [minors' counsel, who argued the mother would relapse again, is] probably right, but I'm not going to stop the services." Emphasizing to the mother that this was her last chance, the court stated, "I'm going to find the best interest for the little boys, not necessarily for you, Ms. C[.], because I think there's a chance that you're going to revert back to what happened before. I hope not, I really do. And I'm doing it for the kids' future. I'm not sacrificing their future. I just think it's based on their demeanor and how they testify and how open they were about their mother. If anything right now, would be not the right thing to do for the mother. That doesn't mean she's going to get the kids back."

Because the six-month review hearing needed to be set in five or six weeks, the court made six-month review findings and set a 12-month review hearing for February 29, 2008. The father filed a notice of appeal challenging the denial of reunification services and the no-visitation order. The minors and SSA filed notices of appeal challenging the order granting reunification services to the mother.[1]

---

[1] The 12-month review hearing was continued to April 22, 2008, the day after oral argument before this court. The minors filed a petition for writ of supersedeas, seeking a stay of the 12-month hearing and a hearing on the mother's petition under Welfare and Institutions Code section 388. We granted a temporary stay of the hearings. Our resolution of the appeal renders

## DISCUSSION

### *The order providing reunification services to the mother was erroneous.*

When a child is removed from the custody of his parents, reunification services must be offered to the parents unless one of several statutory exceptions applies. (Welf. & Inst. Code, § 361.5, subd. (a).)[2] If a parent is described by an exception, the juvenile court "need not" provide him or her reunification services. (§ 361.5, subd. (b).) Under most of the exceptions, the juvenile court "shall not" order reunification services unless it finds, by clear and convincing evidence, that reunification is in the best interests of the child. (§ 361.5, subd. (c).) Thus, " '[o]nce it is determined one of the situations outlined in subdivision (b) applies, the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources. [Citation.]' " (*Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 744 [110 Cal.Rptr.2d 828, 28 P.3d 876].) The burden is on the parent to change that assumption and show that reunification would serve the best interests of the child.

The juvenile court found both the mother and the father fall within the exception in section 361.5, subdivision (b)(13): "[T]he parent or guardian of the child has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior court-ordered treatment for this problem during a three-year period immediately prior to the filing of the petition that brought that child to the court's attention, or has failed or refused to comply with a program of drug or alcohol treatment described in the case plan . . . on at least two prior occasions, even though the programs identified were available and accessible." The mother does not dispute this finding; rather, she contends the juvenile court correctly found reunification with her was in the best interests of her children. We disagree.

The best interest of the child is the fundamental goal of the juvenile dependency system, underlying the three primary goals of child safety, family preservation, and timely permanency and stability. (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2008) § 2.11, p. 2-22.) "The concept of a child's best interest 'is an elusive guideline that belies rigid definition. Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult.' [Citation.]" (*In re Ethan N.* (2004) 122 Cal.App.4th 55, 66 [18 Cal.Rptr.3d 504].)

---

both the 12-month hearing and the section 388 petition moot. Accordingly, we dissolve the temporary stay and deny the petition for writ of supersedeas.

[2] All statutory references are to the Welfare and Institutions Code.

█ Subdivision (b)(13) of section 361.5 "reflect[s] a legislative determination that an attempt to facilitate reunification between a parent and child generally is not in the minor's best interests when the parent is shown to be a chronic abuser of drugs who has resisted prior treatment for drug abuse." (*In re Levi U.* (2000) 78 Cal.App.4th 191, 200 [92 Cal.Rptr.2d 648].) Experience tells us that such a parent has a high risk of reabuse. (See *In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478 [73 Cal.Rptr.2d 793].) This risk places the parent's interest in reunifying with her child directly at odds with the child's compelling right to a "placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306 [19 Cal.Rptr.2d 544, 851 P.2d 826].)

In *In re Ethan N., supra,* 122 Cal.App.4th 55, the court reversed the juvenile court's order providing reunification services to a mother who had caused the death of Ethan's sibling through abuse or neglect and had failed to reunify with his siblings, notwithstanding statutory exceptions allowing the denial of services. (§ 361.5, subd. (b)(4), (10).) The court found the juvenile court failed to apply the correct standards when determining that reunification would be in Ethan's best interests. (122 Cal.App.4th at p. 68.) The juvenile court should consider "a parent's current efforts and fitness as well as the parent's history"; "[t]he gravity of the problem that led to the dependency"; the strength of the bonds between the child and the parent and between the child and the caretaker; and "the child's need for stability and continuity." (*Id.* at pp. 66–67.)

█ As in *Ethan,* the juvenile court here did not apply the correct standards when deciding whether reunification services would be in the children's best interests. Substance abuse is notoriously difficult for a parent to overcome, even when faced with the loss of her children. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531, fn. 9 [65 Cal.Rptr.2d 495].) And the mother's history demonstrated such a difficulty. She had been involved in substance abuse since she was 14 years old. She lost custody of her girls due to alcohol abuse, then repeatedly failed to overcome her drug addiction despite years of reunification services and effort on her part. Any significant periods of sobriety were achieved only while under SSA's supervision. When that support was no longer available, the mother quickly relapsed.

Most significantly, the juvenile court did not consider the children's need for stability and continuity. The children had been removed from both parents' custody three times and from the mother's custody an additional time. Under these circumstances, at least part of the best interest analysis must be a finding that further reunification services have a likelihood of success. In other words, there must be some "reasonable basis to conclude"

that reunification is possible before services are offered to a parent who need not be provided them. (*Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450, 1464 [118 Cal.Rptr.2d 118].) But the juvenile court's own comments confirm our reading of the record: There is no substantial evidence to support the conclusion that William and Noah will reunify with their mother, thereby achieving permanency and stability throughout the remainder of their childhoods.

■ The boys' bonds with the mother cannot be the sole basis for a best interest finding. When reunification is no longer possible, the benefit of the parental relationship to the children is properly considered if the court finds the children adoptable and considers terminating parental rights. (§ 366.26, subd. (c)(1)(B)(i).) The best interests of the child are not served by merely postponing his chance for stability and continuity and subjecting him to another failed placement with the parent.

A juvenile court has broad discretion when determining whether further reunification services would be in the best interests of the child under section 361.5, subdivision (c). (*In re Angelique C.* (2003) 113 Cal.App.4th 509, 523 [6 Cal.Rptr.3d 395].) An appellate court will reverse that determination only if the juvenile court abuses its discretion. (*Id.* at pp. 523–524.) We find there is no substantial evidence in the record to support the juvenile court's finding, by clear and convincing evidence, that further services would be in the children's best interests. Accordingly, the order for such services was an abuse of discretion.

*The order denying reunification services to the father was correct.*

The father does not dispute the juvenile court's finding that further reunification services to him would not be in the children's best interests. Rather, he contends the juvenile court erred in finding he is a parent described in section 361.5, subdivision (b)(13). He argues because he completed his court-ordered treatment, there is no evidence he resisted court-ordered treatment for "extensive, abusive, and chronic use of drugs or alcohol" during the three-year period immediately preceding the filing of the current petition. We disagree.

In November 2001, when the boys were first removed from the parents' custody, the father was ordered to participate in a substance abuse program and submit to random drug tests. He was required to participate in a 12-step program when the boys were returned to parental custody under a family maintenance plan in August 2002. The father participated in the treatment as ordered. In June 2004, the juvenile court found the allegations of the

supplemental petition true and ordered the father to comply with the case plan proposed by SSA in January 2004. That case plan required the father to "successfully complete a Social Services Agency approved substance abuse treatment program which is to include random, observed alcohol testing. . . . Treatment is to continue until the assigned social worker determines in consultation with the treatment counselor that treatment is no longer necessary." The juvenile court amended the case plan to add the requirement that the father "drug test twice weekly with an observed specimen collection." While the father was incarcerated, from February through November 2004, he completed 30 hours of substance abuse prevention classes. Upon his release, the father moved into a sober living home for approximately seven weeks, where he attended 12-step meetings and individual therapy sessions. There is ample evidence that the father participated in court-ordered treatment.

There is also ample evidence that the father resisted the treatment within the three years immediately preceding the filing of the current petition so as to bring him within the exception in section 361.5, subdivision (b)(13). (*Laura B. v. Superior Court* (1998) 68 Cal.App.4th 776, 780 [80 Cal.Rptr.2d 472].) He began using drugs again in November 2006 and continued until he was arrested in February 2007. During that period of time, his drug use was more than occasional, occurring at least every other week. He both smoked and injected methamphetamine. This behavior cannot be considered a simple relapse; rather, it was a resumption of drug use demonstrating resistance to treatment. (*In re Brooke C.* (2005) 127 Cal.App.4th 377, 382–383 [25 Cal.Rptr.3d 590]; *Laura B. v. Superior Court, supra,* 68 Cal.App.4th at p. 780; *Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67, 73 [74 Cal.Rptr.2d 770].)

The father also complains that some of the allegations in the petition were not relevant to jurisdiction but only to disposition, pointing to language alleging the parents' history of involvement with dependency proceedings and their failure to benefit from previous services. The father claims because the juvenile court found the allegations of the petition true by a preponderance of the evidence, SSA was relieved from having to prove the dispositional allegations by clear and convincing evidence, resulting in a gross miscarriage of justice. The father is wrong.

The juvenile court considered all the evidence throughout the proceedings when making its dispositional findings. It clearly stated the standard of proof to deny reunification services was clear and convincing evidence, and it found the evidence met that standard. The fact that the juvenile court had earlier made jurisdictional findings on some of the same evidence using a preponderance of the evidence standard does not impugn the validity of the subsequent dispositional findings. There is substantial evidence in the record to support the dispositional findings by clear and convincing evidence.

## DISPOSITION

The judgment is reversed in part and affirmed in part. The order providing reunification services to the mother is reversed. The order denying the father reunification services is affirmed. The temporary stay of the hearing for the 12-month review and the mother's section 388 petition is dissolved, and the petition for writ of supersedeas is denied as moot. The case is remanded to the juvenile court with directions to enter a new order denying reunification services to the mother and to set a permanent plan selection hearing under section 366.26 as soon as practicable.

Bedsworth, J., and Moore, J., concurred.

A petition for a rehearing was denied June 11, 2008.