Filed 8/6/13  In re Felicity S. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re FELICITY S., A Person Coming Under the Juvenile Court Law. | |
| ELIZABETH V., Petitioner, v. THE SUPERIOR COURT OF THE STATE OF CALIFORNIA COUNTY OF CONTRA COSTA, Respondent; CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU, Real Party in Interest. | A138940 (Contra Costa County Super. Ct. No. J12-00173) |

Elizabeth V. (mother), the mother of Felicity S., filed a petition for extraordinary writ pursuant to California Rules of Court, rule 8.452, after the court terminated her family reunification services and set a hearing pursuant to Welfare and Institutions Code section 366.26.[1] Mother contends that the juvenile court should have granted her request for six additional months of services. We conclude that substantial evidence supports the

---

[1] All further unspecified code sections refer to the Welfare and Institutions Code.

1

juvenile court's decision to terminate family reunification services and deny mother's petition for an extraordinary writ.**2**

# BACKGROUND

### The Petition, Detention, and Jurisdiction

On February 2, 2012, the Contra Costa County Children and Family Services Bureau (the bureau) filed a petition pursuant to section 300, subdivision (b), alleging that Felicity was at substantial risk of harm due to mother's failure to provide for the child's medical needs. Felicity had received emergency medical treatment on four occasions for "uncontrolled diabetes and/or diabetic ketoacidosis, a life threatening condition that occurs as a result of insulin omission." It further alleged that mother had not properly observed Felicity's urine test for diabetic ketoacidosis.

The bureau filed its detention and jurisdiction report, which stated that Felicity was diagnosed with Type 1 diabetes in February 2009. The report noted that mother was working with the bureau and healthcare people to provide the proper care for Felicity.

On March 16, 2012, the bureau filed an amended petition. This petition added the allegation that Felicity had purposely injected herself with an overdose of insulin on March 1, 2012, while in mother's care. On March 12, 2012, Felicity was admitted to the Contra Costa Regional Medical Center Crisis Stabilization Unit because of suicidal thoughts. Mother, according to the petition, minimized the child's attempt to commit suicide. The petition also alleged that mother regularly smoked marijuana while caring for Felicity and was unable to manage Felicity's emotional needs.

The bureau filed another amended petition on May 21, 2012. This petition added an allegation pursuant to subdivision (c) of section 300. This allegation provided that Felicity had exhibited suicidal behaviors and on March 1, 2012, she "took an overdose of insulin as a result of mother's failure or inability to manage the child's emotional needs."

The bureau submitted a memorandum dated March 13, 2012, written by Esmeralda Okendo, a social worker. She recommended that the court detain Felicity.

---

**2** Felicity's father, Larry S., is not a party to this writ proceeding.

Okendo had made an unannounced visit to Felicity's school to meet with her. Felicity disclosed that she was afraid to return home because her mother threatened to hit her and told her that she did not care if the court removed her from the home. Okendo received a "Suspected Child Abuse Report" dated February 22, 2012, stating that Felicity asserted that her mother yelled at her and slapped her on many occasions. Felicity also reported that her mother kicked her once. She revealed that her mother told her that she hoped that Felicity would tell the court that she had been hit and then mother could be rid of her. Felicity also maintained that mother's boyfriend was staying in the home and drinking every night.

On March 16, 2012, the juvenile court detained Felicity, and placed her in the home of Sarah, her half sister. The contested jurisdiction hearing occurred on June 11, and June 20, 2012. The court sustained jurisdiction on all counts.

*Disposition*

The juvenile court held a disposition hearing on October 22, 2012. The court removed Felicity from the home and ordered reunification services.[3] The case plan provided that mother was to participate in individual therapy, complete family counseling, maintain a relationship with Felicity, refrain from using physical punishment, complete a parenting education class, submit to random drug testing, participate in drug testing two hours before visiting with Felicity, attend a 12-step program, and complete an outpatient substance abuse program.

*The Status Review Hearing*

Social Worker Munisha Vohra prepared a status review report dated April 10, 2013. The bureau recommended termination of services as to both parents and the setting of a section 366.26 hearing. The report indicated that mother had not engaged in case plan services. Mother was married in November 2012, and then left for Europe on

---

[3] Mother filed an extraordinary writ petition for habeas corpus, A138655, contemporaneously with an appeal, A137439, from the jurisdictional and dispositional orders, which are still pending. On July 12, 2013, we denied the request to consolidate these actions but ordered the habeas petition and appeal to be considered together.

3

December 14, 2012. Mother failed to maintain any contact with the social worker. The status review hearing scheduled for April 10, 2013, was continued to April 22, 2013.

Subsequently, Vohra prepared a memorandum dated April 16, 2013. According to the memorandum, mother and her new husband visited Felicity in April 2013. Mother's new husband was rude to Felicity and blamed her for everything and told her that she was the reason for mother's having to return to California. Mother never contacted the social worker, despite voice messages left with her asking her to contact the social worker.

The memorandum provided that on April 5, 2013, Felicity had a stomachache and went to the emergency room. On April 9, 2013, she saw a doctor in the emergency room for infected bug bites on her arms, and had a panic attack during this visit.

The status review hearing scheduled for April 22, 2013, was continued until May 6, 2013. This hearing was continued again until May 2013, and again to June 3, 2013.

The juvenile court held the contested combined six-month and 12-month review hearing on June 3 and 4, 2013. The court admitted into evidence the bureau's report dated April 10, 2013, and the memorandum dated April 16, 2013.

Vohra testified that the first element of mother's case plan was to maintain contact with Felicity but mother was in Europe from December 14, 2012, until April 9, 2013, and had no personal contact with Felicity for almost four months. She acknowledged that mother did communicate "almost" weekly by telephone with Felicity during that time. Mother was permitted to have supervised or unsupervised visits and her lack of contact with Felicity was, in Vohra's opinion, "voluntar[y]."

Mother's disregard for Felicity's feelings was evident, according to Vohra, when mother left for Europe in December 2012, and Felicity did not know the date of her mother's departure. When Vohra told Felicity about her mother's leaving for Europe the next day, Felicity "was devastated" and shocked. Felicity cried and stated that she did not want to be with her mother. Subsequently, Vohra acknowledged that Felicity knew that mother was going to leave for Europe, but she did not know the exact date.

Vohra agreed that mother had not violated the requirement that she not use physical punishment with Felicity. She did not believe that mother had attended any of

4

Felicity's medical appointments. Okendo, the prior social worker, had reported that mother had attended training at the hospital. Vohra acknowledged that mother's drug testing was never set up.

Vohra stated that mother did not comply with the orders of the court and had failed to contact her or any other person at the bureau since October 22, 2012. Mother, according to Vohra, had not complied with her plan requirement that she participate in individual and family counseling.

Vohra testified that during the past week she received a phone call from Sarah. Sarah reported that Felicity tried to kill herself on May 29, 2013. Felicity was taken to the hospital and, on May 31, during the early morning, moved to a psychiatric, locked facility for adolescents. This incident occurred while mother was at Sarah's home and Sarah was at work. Felicity went to Sarah's room, took a medication overdose, and telephoned Sarah. Sarah telephoned mother and asked her "what was going on." Mother responded that she did not know what was happening. Sarah, not mother, called 911. Mother, according to Vohra, visited Felicity one night while she was in the hospital but had had no other contact with her. Mother never called Vohra to find out how Felicity was doing.

When asked whether she believed Felicity should be returned to mother's care, Vohra replied, "No." She explained: "[Mother] has not, to my knowledge, completed any part of the case plan, which is her counseling and psychiatric evaluation or family therapy. And [my] other observation is that she has not shown any care for this child. In my conversations that I have [had], especially on April 30th, rather than [show] concern about Felicity's mental health, because Felicity was in a hospital for physical and mental health issues, [over] the last three months on several occasions [mother's] statement was disturbing when she said when I asked her, where have you been all that time when your child was in the hospital? [Mother] said that, where have you been for me?"

Vohra was also troubled over mother's failure to call 911 when Felicity overdosed. Mother never contacted Vohra to inquire about the welfare of her child. Vohra noted that Felicity had remarked on several occasions that she was upset because

5

her mother did not show any concern for her well-being and had not provided any emotional support.

Mother also testified. She claimed that Okendo did not review her case plan with her and mother denied ever signing it. She admitted that Okendo sent her some information on parenting classes in the mail. She stated that Felicity knew that she was planning to leave the United States, and responded "nonchalant[ly]" when told about her departure. She claimed that there was only one departure date and that she told Felicity about it. She asserted that she communicated with Felicity weekly by Skype while she was out of the country. Mother maintained that she also sent Felicity e-mail and text messages a couple of times a week.

Mother stated that she spoke to Sarah almost daily to inquire about Felicity's care. She claimed that she sought out her own individual mental health therapist, and denied ever receiving any referral information about consulting with any other mental health provider. She asserted that she met with the supervisor and manager at the bureau and they told her that she did not need to have direct contact with the social worker.

With regard to the recent incident involving Felicity's taking an overdose of medication, mother said that Sarah called her at 8:10 p.m. to tell her that Felicity had taken pills. She did not call 911 because Sarah said she was calling 911. Prior to her taking pills, mother insisted that Felicity's demeanor was "fine." She said that Felicity was a little upset about a visit with her friend. Felicity had said that she was going to bed and then about 15 or 20 minutes later she received the phone call from Sarah about Felicity's taking pills. She did not go to the hospital that night but stayed with Sarah's son while Sarah went to the hospital. She claimed to have visited Felicity on Thursday, Friday, and Saturday, following Felicity's hospitalization on Wednesday. She acknowledged that she did not call Vohra but explained that she did not need to call her since she spoke directly to Sarah and the health care providers.

On cross-examination, when asked whether she recalled receiving a referral regarding family therapy from Okendo, mother said that she did not receive a letter. When handed a copy of the letter that included the referral, she admitted that she did

6

receive the referral regarding family therapy. Mother also acknowledged that she received a copy of her case plan.

When asked whether she believed that Felicity should be returned to her, mother responded that she did. Mother admitted that she was currently living outside of the United States and that she had made no arrangements to take Felicity home. The court asked mother what arrangements she had made for Felicity regarding school and medical coverage. Mother responded, "Well, I've already looked into all of that in the Czech Republic. But if she were to return to me immediately, that whole process would take many months to get everything in order before she would be ready to move." Mother admitted that she was not currently ready to take Felicity. She admitted, "Right now I don't have the facility [*sic*] for her." Mother stated that she was planning to leave the country in June, and that she had told Felicity about her impending departure.

Counsel for Felicity agreed with the bureau's position to terminate reunification services. Counsel stated: "As I see it regardless of whether [mother] has complied with the case plan or not complied with the case plan there's essentially no change in where we are now from where we were at the beginning. In fact, we may even be further behind, because I think her level of indifference on this child's plight is greater than it was when we started this case. [¶] What she testified to about the events of last week was just stunning to me. And 10 feet away from her she hears that her child attempted to commit suicide and she essentially does nothing. . . ."

At the end of the hearing, the juvenile court stated, in pertinent part, the following: "The issue presented at the six and 12-month review contest was whether or not the mother was in a position to take Felicity into her care today or whether the court should as an alternative extend services to the 18-month mark, or in the further alternative whether the court should adopt the recommendations that are submitted by the bureau in [its] report and set a [section 366.26] hearing.

"It is clear to me based on the facts that are evidence in the report and from testimony adduced at this hearing that this court has no alternative but to adopt the

7

recommendations submitted by the bureau. This is not a close case. This is not even a case where there is another side or another alternative that has to be seriously debated.

"Felicity as I speak is recovering from another 5150, one in which her mother was at hand and for a second significant lapse failed to take the appropriate directive and immediate actions that were needed for Felicity's care. I'm not satisfied that her mother has any insight into the fragility of Felicity's emotional and physical health and as a result is intent on making plans that seem to completely overlook Felicity's needs and only take into account her own personal needs making Felicity's needs subservient to her own needs. If the court were to go along with that that would subject Felicity not only to the immediate risk and detriment to her safety and physical and emotional safety but would also subject her to a plan of action that was completely lacking in detail and lacking in any kind of forethought or care that someone of Felicity's needs would have to have considered."

The juvenile court adopted the bureau's recommendations to terminate services and set the matter for a section 366.26 hearing on September 20, 2013. In its order following the hearing, the court further ruled that mother failed to contact or visit the child sufficiently and that she failed to participate regularly in the court-ordered treatment plan.

Mother filed a petition for extraordinary writ in this court and requested a stay.

## DISCUSSION

Mother maintains that the juvenile court should have extended her reunification period beyond 12 months to 18 months because the record establishes that she substantially complied with her case plan and that Felicity could be returned to her in the next six months (§ 366.21, subd. (g)(1)). She also contends that services should have been extended under the extraordinary case exception. (See §§ 361.5, subd. (a)(3); 366.22, subd. (b).) The extraordinary circumstances were, according to mother, that she was out of the country for four months and Felicity's mental health concerns.

Unless an exception applies, the court shall provide reunification services for no longer than 12 months from the date the child entered foster care. (§ 361.5, subd.

8

(a)(1)(A).) Here, Felicity was detained on March 16, 2012, and on June 4, 2013, more than 12 months later, the juvenile court terminated mother's reunification services.

Court-ordered reunification services may be extended to a maximum of 18 months from the date a child was originally removed from a parent's custody (in this case, to September 16, 2013), *but only if the* court finds a substantial probability that the child will be returned to the parent within the extended period or that reasonable services have not been provided. (§§ 361.5, subd. (a)(3); 366.21, subd. (g)(1).) Here, mother does not claim that the services offered were unreasonable, but argues that the record shows a substantial probability that the child will be returned within the extended reunification period.

To find a substantial probability of return within the extended reunification period, the court must find the parent has: (1) consistently visited the child; (2) made "significant progress" in resolving the problems that led to the child's removal; *and* (3) demonstrated the capacity and ability to complete the objectives of the case plan and to provide for the child's safety, protection, and physical and emotional well-being, and special needs. (§ 366.21, subd. (g)(1); Cal. Rules of Court, rule 5.715(b)(4)(A).)

We review the juvenile court's finding to determine whether it is supported by substantial evidence. We resolve all conflicts in the evidence in favor of the juvenile court's ruling and draw all legitimate inferences in its favor. (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.) Mother has the burden of showing the evidence was insufficient to support the court's findings and order. (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1135, disapproved on another ground in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6, superseded by statute on another issue.)

On appeal, mother does not argue that the juvenile court should have immediately returned Felicity to her care. Indeed, at the status review hearing mother admitted that she was not ready to take care of Felicity, and stated "that whole process would take many months." Mother's contention on appeal is that the juvenile court should have extended services for an additional six months. The evidence in the record, however, does not support her argument.

The record establishes that mother cannot satisfy any of the three requirements under section 366.21, subdivision (g). Mother did not consistently visit Felicity. Mother was in Europe from December 14, 2012, until April 9, 2013, and, although she communicated weekly with Felicity by Skype, she had no personal contact with her during this period.

Additionally, the record established that mother had made little, if any progress, towards, resolving the problems that led to Felicity's removal and she did not demonstrate a capacity or ability to complete the objectives of her case plan. Felicity was removed partly because of mother's inability to attend to her medical needs. Additionally, the petition alleged that mother could not manage Felicity's emotional needs. Felicity had tried to commit suicide on March 1, 2012, and was admitted for having suicidal thoughts to the Contra Costa Regional Medical Center Crisis Stabilization Unit on March 12, 2012. Less than one year later, mother left and stayed in Europe for almost four months.

Furthermore, once mother returned from the Czech Republic in April 2013, she still demonstrated little progress towards handling Felicity's emotional problems. In May 2013, Felicity again took an overdose while with mother. Mother did not call 911, but relied on Sarah's calling for help. She also did not accompany Felicity to the hospital and, according to the social worker, visited Felicity only once. Mother never called Vohra to find out how Felicity was doing, although she claimed that she called Sarah and other medical care people. Felicity repeatedly told Vohra that mother never inquired about her health or hospitalizations.

Mother also did not comply with the requirement of her case plan that she participate in family therapy. She first claimed that she never received any referral but, after confronted with the letter containing the referral information, she admitted receiving it. She also did not attend Felicity's medical appointments.

Furthermore, as the juvenile court noted, mother showed a complete lack of understanding or compassion regarding Felicity's fragile condition. Mother's disregard for Felicity's emotional state was further evidenced by her failure in December 2012 to

10

tell Felicity the exact date she was leaving the country. Vohra maintained that Felicity was devastated when informed that mother was leaving the country without telling her. Mother disputed this and claimed she had informed Felicity, but the court was entitled to disbelieve mother's rendition of events. Upon her return to California, she expected Felicity to move to the Czech Republic with her even though Felicity was both medically and psychologically fragile. She had made no arrangements in the Czech Republic for Felicity's schooling or medical care.

Accordingly, we conclude that the record supported the juvenile court's finding that services should not be extended under section 366.21, subdivision (g)(1).

Mother also maintains that the juvenile court should have extended services under the exceptional circumstances exception and cites section 366.22, subdivision (b) and section 361.5, subdivision (a)(3). She argues in a conclusory fashion that services should have been extended because of her absence for four months in the Czech Republic and Felicity's mental health issues.

In exceptional or "rare instances" juvenile courts have discretion to continue services beyond 12 and 18 months. (See, e.g., *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1777-1778 [when a parent has an "impeccable record of visitation," and has made every effort to comply with the reunification plan, but is hospitalized for mental illness for all but five months of the reunification phase of the dependency proceedings, the juvenile court has the discretion to continue reification services].) Under section 366.22, subdivision (b), a court may order an additional six months of services if the parent is making progress in a residential drug treatment program, is recently discharged from incarceration or institutionalization, or is in custody of the United States Department of Homeland Security. However, the court must find by clear and convincing evidence that services are in the child's best interest *and* that there is a substantial probability that the child will be returned to the physical custody of his or her parent. Section 361.5, subdivision (a)(3) provides that a court shall consider the special circumstances of an incarcerated or institutionalized parent, a parent in a court-ordered residential substance abuse treatment program, and a parent arrested and issued an immigration hold when

deciding whether to extend services "up to a maximum time period not to exceed 18 months after the date the child was originally removed from physical custody of his or her parent or guardian if it can be shown . . . that there is a substantial probability that the child will be returned to the physical custody of his or her parent . . . within the extended time period" or that reasonable services have not been provided.

The present case does not present exceptional circumstances. Mother claims that the combination of her four months in Europe and the fragility of her daughter created exceptional circumstances justifying the extension of services. Mother, however, was provided with services throughout the dependency proceedings and her travel to Europe was not an external factor preventing her from participating in the case plan. Mother voluntarily chose to leave the country and her fragile daughter. Not only was there no external barrier to mother's receiving services, mother cannot demonstrate "a substantial probability that the child will be returned" to her physical custody. (See §§ 366.21, subd. (g)(1), 361.5, subd. (a)(3).) As already discussed, mother failed to demonstrate that she made any significant progress in meeting the goals of her case plan. Mother also has made no showing that a continuation of services would be in Felicity's best interests.

Since we have concluded that substantial evidence supported a finding that mother failed to make significant progress, a required finding for substantial probability of return, we affirm the juvenile court's order terminating mother's reunification services.

## DISPOSITION

The petition for extraordinary writ is denied on the merits. (See Cal. Const., art. VI, § 14; *Kowis* v. *Howard* (1992) 3 Cal.4th 888; § 366.26, subd. (*l*)(1) [precluding further challenge to these orders by petitioner in any subsequent appeal].) The request for stay of the section 366.26 hearing, which is set for September 20, 2013, is denied. Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.264(b)(3).)

12

_____
Brick, J.*

We concur:


_____
Kline, P.J.


_____
Haerle, J.

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.