Filed 9/27/13  A.A. v. Superior Court CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| A. M.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>        Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU, et al.,<br><br>        Real Parties in Interest. | A139228<br><br>(Contra Costa County<br>Super. Ct. No. J13-00084, J13-00085) |

A.M. (Mother), mother of J.M., born in January 2013, and F.F, born in December 2010, petitions under California Rules of Court, rule 8.452 to vacate an order setting a selection and implementation hearing for the minors pursuant to Welfare and Institutions Code section 366.26.[1]  F.F. and J.M. are Mother's sixth and seventh children.  The previous five were removed from her custody, and she failed to reunify with them.  Reunification services to Mother were terminated for the first two children in 2004, and for the next three in 2008.

Mother was denied reunification services for J.M. and F.F. pursuant to section 361.5, subdivision (b)(10), which provides that services may be withheld if they have previously been terminated for siblings, and the parent "has not subsequently made a

---

[1] Subsequent statutory references are to the Welfare and Institutions Code.

1

reasonable effort to treat the problems that led to removal" of the siblings. Mother contends that the court erred in finding that she had made no such effort, but we conclude the finding was supported by substantial evidence. We therefore uphold the order setting the section 366.26 hearing.

## I. BACKGROUND

Mother has had a drug problem for at least two decades. She completed inpatient substance abuse programs in 2002, 2004, and 2010, but she admitted smoking methamphetamine while pregnant with J.M. and tested positive for methamphetamine when J.M. was born in January 2013. Dependency petitions were filed for J.M. and F.F. on January 22, 2013, alleging Mother's failure to protect based on her serious and chronic substance abuse problem (§ 300, subd. (b)), and her failure to reunify with the minors' siblings (§ 300, subd. (j)). The petitions were sustained, and J.M. and F.F. were adjudged dependent children.

In May, the Contra Costa County Children and Family Services Bureau (the Bureau) prepared a dispositional report stating that J.M. and F.F. were placed together in a foster home. The foster mother likened two-year-old F.F.'s behavior to that of a "wild fox, always on the move." F.F. "presented as a child who had never been disciplined and was used to fending for herself." The foster mother stated that "when [F.F.] gets upset, she will 'attack,' kicks, spits, bites, etc. . . . [F.F.] continues to have 'nightmares,' screaming in her sleep." F.F. followed the foster mother everywhere, and cried when she lost sight of her. F.F. also had a "demonstrated fear of men."

The Bureau reported that Mother successfully completed a three-month residential drug treatment program at The Rectory on April 15. The Rectory recommended that Mother complete a six-month outpatient treatment program at the Aurora Project, and obtain at least one or two years of trauma therapy to address "abuse issues." She also "need[ed] to continue with her sponsor and attend[] meeting[s] 3-5 times per week." Mother got on the waiting list for the Aurora Project in mid-April and entered Rosewood House, a sober living environment that provides transitional housing for women. Mother had eight negative drug tests, with one "No Show," from February 27 to April 23. She

2

attended all sessions at a parenting skills program from January 22 to April 15. She had hour-long supervised visits with the children twice a month, and missed only one visit because she was late.

Although by mid-May Mother was "enthusiastically doing all that she could to have her two young children returned to her custody," the Bureau recommended against providing her reunification services, stating: "It has been the mother's pattern to do very well while [in] residential treatment, then to fail to follow through once discharged from residential treatment. . . . The concern is the mother's ability to maintain her sobriety long term. It would be unfair to these very young children to have to wait long enough to see what the mother's future holds. . . . Based on the mother's history, it is unlikely that the mother will maintain long term sobriety."

The dispositional hearing was continued from May 16 to July 11. In a supplemental report for the hearing, the Bureau stated that, after mother moved into Rosewood House, she "started as energetic, hopeful and excited about her sobriety . . . During the early weeks of May, the mother secured two part-time jobs . . . ."

However, "[o]n May 30, 2013, the mother was discharged from Rosewood House for failing to return home. The mother's cell phone was disconnected. On June 9, 2013, the mother's father passed away. The mother stopped going to both places of employment. The mother only attended Project Aurora one time. She stopped random drug testing due to transportation issues. In June, the mother missed several visits with the children, either for being late or for not confirming scheduled visits. [¶] As of July 7, 2013 the mother was staying with her mother in Fairfield. The maternal grandmother, guardian of the mother's middle three children, lives in subsidized housing. Also, currently staying in the home is the mother's aunt and the mother's nineteen-year-old son . . . . The mother still did not have a telephone number. She stated that she was still not enrolled in the Project Aurora, that she had not sought out individual therapy, and that she had not contacted her (twelve step) sponsor."

At the dispositional hearing, Mother testified via an offer of proof that she was not drug testing through the Bureau because of transportation issues, but that she had tested

two weeks earlier through the probation department.  She now had "a letter and the necessary documentation" to start testing in Vallejo, and was willing to test on the day of the hearing.  She was going to AA meetings but forgot to bring confirming documentation.  She had a 12-step sponsor named Jodie and was looking for another one in the area where she was currently living.  She had been on the waiting list at the Fairfield Mental Health Organization for a month and a half and had an appointment there on July 16.  She missed two visits with the children because of transportation problems.  She was looking for work.

On cross-examination, Mother stated that she was participating in the Healthy Partnership drug treatment program in Fairfield, but she had nothing to verify her enrollment.  She did not bring any documents substantiating her recent activities because she thought the hearing was going to be about paternity issues.  She was discharged from Rosewood House because she left the residence and did not return by the home's 10:00 p.m. curfew.  She returned late because her father was in the hospital.  She had never completed an outpatient drug treatment program after finishing a residential one.

On redirect examination, Mother testified that she believed she could maintain her sobriety because "I really really want it this time.  This is so scary having my kids away from me like this, people telling me I might not ever see them again.  And I just I don't want it any more, and I want to just do right."

The court found that reunification services to Mother had been terminated for J.M. and F.F.'s siblings, and that she had not subsequently made a reasonable effort to treat the problems that led to the siblings' removal.  The court further found that providing Mother with reunification services would be detrimental to J.M. and F.F.  No services were ordered, and a section 366.26 hearing was set for November 6.

## II.  DISCUSSION

" ' "Once it is determined one of the situations outlined in [section 361.5,] subdivision (b) applies, the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources." ' " (*R.T. v. Superior Court* (2012) 202 Cal.App.4th 908, 914 (*R.T.*), quoting *Renee J. v.*

4

*Superior Court* (2001) 26 Cal.4th 735, 744.)  An order denying services under the statute is reviewed for substantial evidence.  (*R.T.*, *supra*, 202 Cal.App.4th at p. 914.)

"[T]he inclusion of the 'no-reasonable effort' clause in the statute provides a means of mitigating an otherwise harsh rule that would allow the court to deny services simply on a finding that services had been terminated as to an earlier child when the parent had in fact, in the meantime, worked toward correcting the underlying problems." (*In re Harmony B.* (2005) 125 Cal.App.4th 831, 842.)  However, the clause cannot be read to mean that "*any* effort by a parent, even if clearly genuine, to address the problems leading to removal will constitute a reasonable effort . . . ." (*R.T.*, *supra*, 202 Cal.App.4th at p. 914.)  "And while the degree of progress is not the *focus* of the inquiry, a parent's progress, or lack of progress, both in the short and long term, may be considered to the extent it bears on the *reasonableness* of the effort made." (*Ibid.*)

Substantial evidence supports the court's decision to deny Mother reunification services.  Mother completed a residential drug treatment program after services for her other children were last terminated in 2008, but she had relapsed into drug use by the time she was pregnant with J.M.  Although she completed another residential treatment program after J.M. and F.F. were removed, she did not substantiate her participation in outpatient treatment, attendance at AA meetings, or submission to drug testing, at the time of the dispositional hearing.  As her counsel put it at the hearing, "she did well . . . almost until June.  And it was then that things kind of fell apart."  The record supported a finding that Mother failed to make reasonable efforts to treat the problem that led to removal of the siblings.

Mother argues that, even if that finding was justified under section 361.5, subdivision (b), the court was compelled to find under subdivision (c) of the statute that services were warranted because it was in J.M.'s and F.F.'s best interests to reunify with her.  However, subdivision (c) "becomes relevant *only if* one of the enumerated bases for denying reunification services [under subdivision (b)] applies *and* the juvenile court contemplates exercising its discretion to order services regardless.  If the court contemplates ordering services, section 361.5, subdivision (c), requires that the court first

find that reunification is in the best interest of the child . . . .  Here, the juvenile court was not required to make a finding under subdivision (c), given its decision not to order [such] services . . . .  We shall therefore disregard the portions of mother's petition that erroneously reference subdivision (c)." (*R.T.*, *supra*, 202 Cal.App.4th at pp. 913–914, fn. 3)

## III.  DISPOSITION

The order to show cause is discharged, and the petition for extraordinary writ is denied on the merits.  (See § 366.26, subd. (l); *In re Julie S.* (1996) 48 Cal.App.4th 988, 990–991.)  Our decision is final immediately.  (Cal. Rules of Court, rules 8.452(i), 8.490(b).)


_____
Siggins, J.


We concur:


_____
McGuiness, P.J.


_____
Pollak, J.