Filed 5/1/14  In re S.H. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re S. H., a Person Coming Under the Juvenile Court Law. | |
| C.C., <br><br>        Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF CONTRA COSTA COUNTY, <br><br>        Respondent, <br><br> CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU, <br>        Real Party in Interest. | A141004 <br><br> (Contra Costa County Super. Ct. No. J12-01390) |

C.C. (Mother), the mother of minor S.H., petitions under rule 8.452 of the California Rules of Court to vacate an order setting a selection and implementation hearing pursuant to Welfare and Institutions Code section 366.26.[1]  Mother claims she should have been offered additional reunification services after the 12-month review hearing.  The order setting the section 366.26 hearing is supported by substantial evidence, so we must deny the petition on its merits.

---

[1]All further statutory references are to the Welfare and Institutions Code. References to rules are to the California Rules of Court.

1

# BACKGROUND

S.H. was six years old when the Contra Costa County Children and Family Services Bureau (the Bureau) initiated this action. In September 2012 Mother was arrested for a theft, captured on videotape, in which she had S.H. push a shopping cart loaded with stolen items out of a Concord K-Mart store. An ensuing probation search of Mother's home produced a methamphetamine pipe and lighter on a nightstand in her bedroom easily within the possible reach of S.H. and S.G., an unrelated four-year-old boy who was then staying at Mother's house. In the garage, police found a small plastic baggie containing what appeared to be methamphetamine or narcotics, a pouch containing eight hypodermic needles, and other paraphernalia. Mother admitted shoplifting, but she initially denied any knowledge of the needles and said the pipe in her bedroom belonged to her ex-boyfriend, who had moved out of the house the previous week. But upon further questioning she admitted to a recent relapse from her efforts to stay drug free. Mother was arrested and the children were placed in emergency foster care.

The following day S.G.'s mother told the Bureau social worker that she met Mother when the two were in drug treatment at Orchid Women's Recovery Center (Orchid) in 2007. S.G.'s mother was homeless and had recently arranged for her son to stay with Mother until she got on her feet and found stable housing. She told the social worker that Mother had a history of using crack cocaine, but she was "shocked" that Mother had a meth pipe in her possession and denied that Mother was currently using drugs. S.G.'s mother said she was clean, but then admitted that she also had used methamphetamines within the previous week. She denied that she used drugs with Mother, whom she trusted.

Both of S.H.'s parents have extensive criminal histories and substance abuse problems.[2] The family has a case history with the Bureau involving allegations of neglect, abuse, and drug use dating back to 1994. S.H. was removed from her parents'

_____

[2]S.H.'s father was incarcerated at the time of Mother's arrest. He is not a party to these writ proceedings.

care in 2008 due to Mother's substance abuse and Father's incarceration, but Mother completed family reunification services and was granted sole custody of S.H. in September 2009. S.H.'s older half-sister, S.C., was placed in foster care in 2001 and was in guardianship with her paternal grandmother, Shirley M., at the time of these proceedings. S.H. was placed with Shirley M. and S.C. in October 2012.

On November 1, 2012 the juvenile court sustained an allegation under section 300, subdivision (b) that Mother had a serious and chronic substance abuse problem that impaired her ability to care for S.H. The disposition hearing was held on December 20. Mother was in jail. The Bureau recommended that family reunification services be provided to both parents. Mother's case plan required her to engage and receive positive evaluations in individual counseling, parenting education classes, and an approved inpatient substance abuse program. The court also ordered Mother to comply with random drug and alcohol testing, to test negative for six months, and to participate in a 12-step program.

Mother was still incarcerated at the six-month review in June 2013, but she expected to be released on July 26. She was participating in services and arranging to enter an intensive outpatient drug treatment program upon her release. While in jail, Mother engaged in 45 hours of relapse prevention education, nine hours of anger management, 25.5 hours of trauma recovery, 9 hours of parenting education, and 3 hours of individual therapy. The court adopted the Bureau's recommendation of continued family reunification services.

At an interim hearing on August 29, the Bureau reported that Mother was released from jail on July 31 and immediately started supervised visits with S.H. three or four times per week. S.H. told the social worker that she enjoyed Mother's visits. Mother met with the social worker to discuss her reunification case plan and was given referrals for drug treatment, counseling, parenting and transportation assistance, and help securing housing. Mother's first random drug test, on August 21, was negative. On August 30 Mother entered the Orchid Women's Recovery Group residential drug treatment program (Orchid).

3

The 12-month review was initially scheduled for October 21, 2013, although it was not concluded until a contested hearing on February 3, 2014. The Bureau's recommendation was to continue offering Mother reunification services for the extended 18-month reunification period. Orchid recommended that Mother complete its six-month residential program, but Mother would only agree to a three-month stay to be followed by three months at an outpatient program. On October 24, Orchid counselor Pamela Jackson reported that Mother "is not addressing her drug and alcohol problem and has stated that neither is a problem and she is only at the program to fulfill her Court order requirements." Mother had refused a referral for a mental health evaluation, and, according to Ms. Jackson, "does not appear to adapt well to life skills presented, is not focused on the program or her recovery and is pre-occupied with getting a certificate at the 90 day mark to show the Juvenile Court and Children & Family Services."

Mother was discharged from Orchid short of the three-month mark, on November 5, without graduating after she violated the terms of a pass to leave the premises and was found in a vehicle with two men. She had tested negative for drugs nine times, although she missed three tests, on August 16, September 4, and September 9.

Mother started at the Ujima outpatient program on November 14. On January 2, 2014, Ujima drug counselor Ms. Favage reported that Mother was missing one or two classes per week, was not good at taking accountability, and was "not following program procedures when not in group." Moreover, either Favage or program staff "have had to contact [Mother] to inquire of her whereabouts when it should be [Mother] calling to state she is not coming and why."

On January 31, 2014, the Bureau changed its recommendation and asked the court to terminate reunification services and set a hearing pursuant to section 366.26. Mother was scheduled to complete the 90-day Ujima program on February 14, but her attendance was poor and she dropped out after approximately two months. Her attendance at individual therapy was also poor, and she missed another drug test on December 23. On January 8, shortly after her discharge from Ujima, Mother entered the Frederic Ozanam Center residential treatment program. The Bureau observed that she would be able to

4

complete a 90-day stay in the Ozanam Center program by April 7, and a 180-day stay, if recommended by program staff, by July 7. But on January 31, just over 16 months into her 18-month extended reunification period, the Bureau reported that Mother had not taken advantage of the reunification services she had been offered. Although she "has proven that she can begin service engagement," she "has been unable to complete any programs since her release from jail."

The 12-month review hearing was held on February 3. Mother testified that she left the Orchid program after 66 days because she was worried about paying her bills, her house had been robbed while she was in jail, and she was trying to make sure her housing was secure. She explained that "I didn't think outside the box to shut off all my utilities and just stay right there. I thought if I could maintain my household and do the program, that all would be well because I would still have my bills in order and they wouldn't overlap. I didn't think outside the box as to turn off PG&E, which is what I should have did. But instead, I thought if I could live there and make payments on it, it would be okay. So around holiday time maybe me and [S.H.] would be together. But unfortunately, it didn't go the way I thought it should go. Maybe it wasn't the right program for me." She said she did not subsequently complete the Ujima program because her case worker told her that her case plan required a residential inpatient program unless the court approved a change. On February 2, Mother's counselor at the Ozanam Center reported that she had complied with all program guidelines since entering the program on January 8 and had attended scheduled groups and classes. Her anticipated completion date was April 8. Mother liked the program and felt it could provide the help she needed.

Social worker Sandra Andrade testified that Mother's almost daily supervised visits with S.H. generally went very well, and that S.H. was very connected to her mother. Mother had tested clean on all dates in the most recent period, with the exception of the missed test on December 23. While in the Orchid program, Mother refused a mental health evaluation and to do an extended program. According to staff in the Orchid program, she did not acknowledge her substance abuse problem or focus on

addressing it. Instead, "they really felt that she was there simply to get a certificate of completion to give to CFS." Based on her interaction with Mother, Andrade did not feel she understood she had a significant drug problem. Her experience, like Orchid staff's, was that Mother "continues to be consumed with housing and bills and transportation. She doesn't talk about the drug problems, her drug history, her drug use, relapse prevention. She talks about wanting [S.H.] back home. She talks about how she needs [S.H.] and [S.H.] needs her."

Mother had not participated in individual counseling on a regular basis. She participated in very limited counseling during her inpatient program because she had not completed the program. She also attended about three counseling sessions outside of a program, but was either discharged or discontinued for lack of attendance. Mother's therapist at Orchid told Andrade that they had "difficulties engaging her."

Mother's counsel asked the court to continue reunification services for another six weeks, until the 18-month hearing set for March 27. Counsel emphasized that, while Mother's compliance was not perfect, she consistently tested negative for drugs with only a few missed tests. She went directly from Orchid to the Ujima outpatient program and, when she concluded that an inpatient program was necessary and appropriate, went directly into the Ozanam Center program. She had participated in therapy and NA/AA, and visited S.H. almost daily when she was not in residential treatment. She and S.H. were very attached to each other. Counsel urged that Mother's period of incarceration established an exceptional circumstance that warranted allowing her more time to show S.H. could be returned to her.

Counsel for the Bureau and S.H. disagreed. The Bureau emphasized that Mother failed to complete her programs after her release from jail, and that while she was in treatment she had not demonstrated insight into her substance abuse problems. S.H.'s counsel echoed those comments and argued that "there really isn't any possible way that she'd be able to show this Court that her daughter can safely be returned to her care" within the less than two remaining months of the extended reunification period.

6

The court adopted the Bureau's recommendation. It explained: "It is true that mother availed herself of services while detained. Really, when you look at the history, however, it seems that mom does okay when she has that sort of structure. The real difficult question is when she's not in custody, what does she do with her time? [¶] And in determining whether or not there's a substantial probability that the child will be returned to mother by the 18-month date, which is March 27th, you have to look at the history, you have to look at the whole package as it presents itself. And what we have is a mom who has a criminal record spanning almost 30 years. She has a long-standing substance abuse problem. She has lost other children in court proceedings or to legal guardianship. And, in fact, I believe [S.H.] had previously been part of referrals to Children & Family Services for neglect, which appear to the Court to be very related to the substance abuse issues which is why the family came before the Court in this instance."

The court emphasized that S.H. was "pushing the cart full of stolen property when mother was contacted by Concord PD. That when this case ultimately came before the Court it was because mother fled the residence that was being searched by officers when she had several felony warrants out for her arrest. She left the house leaving [S.H.] behind, who was only six and a four-year-old boy that mother was tasked with taking care of. . . . In the house they found a meth pipe and numerous syringes. So that's the backdrop." Although Mother was "in desperate need of recovery and substance abuse treatment," she displayed a lack of understanding that she needed to address her drug problem before she could reunify with her daughter. The court concluded there was no substantial probability that S.H. would be returned to Mother by March 27 and, by clear and convincing evidence, that it was in S.H.'s best interest to set a hearing pursuant to section 366.26. The court set the hearing for May 29 and advised Mother of her obligation to file a writ to preserve her right to appeal its order. Mother filed a timely writ petition.

7

## DISCUSSION

### I. The Legal Framework

Court-ordered reunification services may be extended to a maximum of 18 months from the date a child was originally removed from the parent's custody, but only if the court finds a substantial probability that the child will be returned to his or her parent within the extended time period or that reasonable services have not been provided. (§§ 361.5, subd. (a)(3), 366.21, subd. (g)(1).)  Mother disputes the court's finding that there was no substantial probability she could reunify with S.H. if given an additional six weeks of reunification services, and asserts that her demonstrated efforts and progress towards reunifying with her daughter requires that she be provided the maximum 18 months of reunification services.  We review the court's finding to determine whether it is supported by substantial evidence, resolving all conflicts in the evidence in favor of the juvenile court's ruling and drawing all legitimate inferences in its favor.  (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.)  Mother has the burden to show the evidence was not sufficient to support the court's findings and order.  (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1135, disapproved on another ground in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.)

To find a substantial probability the child will be returned within the extended reunification period, the court must find the parent has: (1) consistently and regularly visited with the child; (2) made significant progress in resolving the problems that led to the child's removal; and (3) demonstrated the capacity and ability to complete the objectives of her treatment plan and to provide for the child's safety, protection, and physical and emotional well-being.  (§ 366.21, subd. (g)(1); see rule 5.715(b)(4)(A).)  Here, there is no question but that Mother consistently and regularly visited with S.H.  She has also consistently tested negative for drugs, which, despite several missed tests, is a laudable indication of her efforts to stay clean.  But the question at the 12-month hearing was whether Mother would be able to complete the objectives of her case plan and safely care for S.H. within the extended 18-month period, which in this case ended just six weeks after the 12-month hearing.  The court's conclusion that she would not is

8

supported by Mother's long history of drug abuse problems and related issues of child neglect, by her failure to recognize and address her drug problem, and her inability or unwillingness to successfully complete the treatment programs she was offered.

It is clear from the record that no one in the courtroom doubted Mother's love for her daughter. But the court's finding that it was not substantially probable S.H. could be returned to her care with an additional six weeks of reunification services has support in the evidence. "In juvenile cases, as in other areas of the law, the power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact. All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the verdict, if possible. Where there is more than one inference which can reasonably be deduced from the facts, the appellate court is without power to substitute its deductions for those of the trier of fact." (*In re Katrina C.* (1988) 201 Cal.App.3d 540, 547.) Mother's longstanding history of drug abuse and prior dependency proceedings, coupled with her inability to successfully and timely complete programs made available to her through reunification services, precludes us from substituting any deductions of our own for those made by the juvenile court. Mother has made significant progress in addressing some of the problems leading to this dependency and she is closely bonded to her daughter. Were it our role to decide in the first instance whether she should be extended further services, we might give her more time. But it is not. On this record, the decision of the juvenile court must be affirmed.

## DISPOSITION

The order to show cause is discharged, and the petition for extraordinary writ is denied on the merits.  (See § 366.26, subd. (*l*); *In re Julie S.* (1996) 48 Cal.App.4th 988, 990–991.)  Our decision is final immediately.  (Rules 8.452(i) & 8.490(b).)

_____
Siggins, J.

We concur:

_____
Pollak, Acting P.J.

_____
Jenkins, J.