Filed 7/21/14  In re A.K. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.K., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E059653 |
| Plaintiff and Respondent, | (Super.Ct.No. J249507) |
| v. | OPINION |
| G.K., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Lily Sinfield, Judge.  Affirmed.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, Kristina M. Robb and Adam E. Ebright, Deputy County Counsels, for Plaintiff and Respondent.

1

G.K. (mother) is the mother of A.K. (child), born in April 2013. Mother is also the mother of the child's two older half-siblings, who were ages five and three on the date of the challenged orders and who were declared dependent children prior to the child's birth. Mother appeals from the juvenile court's jurisdictional and dispositional findings of September 11, 2013. Specifically, mother argues: (1) the jurisdictional findings are not supported by substantial evidence; (2) the court erred when it denied reunification services to mother; and (3) the notice sent to the Native American tribes was prejudicially deficient under the Indian Child Welfare Act of 1978 (ICWA) 25 United States Code, section 1901 et seq. As discussed below, we reject mother's arguments and affirm each of the challenged orders.

## FACTS AND PROCEDURE

*Detention—May 2013*

In April 2013, mother gave birth to the child in a hotel room and did not alert medical or other authorities about the child's birth. Mother did not seek medical assistance for the birth, or for the child afterward, because she had an open dependency case regarding the child's siblings,[1] and feared the child would be removed from her.

---

[1] The child's siblings, then ages three and one, were detained in Los Angeles County in January of 2012 while mother was incarcerated for assault with a deadly weapon on the father of one of the children. Mother failed to make appropriate provisions for the siblings' care in that she left them with her own mother (maternal grandmother), who was homeless and lived with the siblings in a vehicle. Although the maternal grandmother fed the children and took them to day care, and although they appeared to be bonded with her, personnel responding to a concerned citizen's report found the children to be extremely dirty. The car in which they were living had a broken rear window and smelled strongly of urine. In addition, the maternal grandmother

*[footnote continued on next page]*

2

The child's existence came to the attention of Children and Family Services (CFS) on May 19, 2013, after San Bernardino County Sheriff's deputies investigating a report of possible methamphetamine arrested mother on an outstanding warrant for making criminal threats against a CPS worker or foster parent. Deputies told the responding social worker that mother was known to law enforcement from previous arrests for violent offenses, and that she was often aggressive and combative. The social worker noted that mother appeared to be "agitated, combative and was crying" and that she was cursing and "throw[ing] herself around her cell." Mother had asked to leave the child with her current boyfriend, the father of another of her children, but he did not pass a background check. Mother signed a voluntary release of custody for the child. The child was immediately detained and placed in a foster home near her half-siblings.

Mother's prior child welfare history began in Hawaii in 2008 when the oldest sibling was an infant. A general neglect referral was generated because mother was having mental health issues and made statements that she could not care for that sibling. The family moved to California shortly thereafter. In 2009 and 2010, nine referrals were generated for physical abuse, general neglect and emotional abuse. Only one of the referrals was substantiated.

---

presented with apparent mental health issues and was extremely uncooperative and evasive. Mother received reunification services but failed to make sufficient progress on her case plan. Specifically, mother failed to seek treatment for her mental health issues and never completed the ordered psychiatric evaluation. On September 11, 2013, the same day as the orders challenged here, the juvenile court terminated services as to the siblings and set a Welfare and Institutions Code section 366.26 hearing.

*Juvenile Dependency Petition—Welfare and Institutions Code Section 300*[2]

On May 21, 2013, CFS filed a section 300 petition alleging, as to mother: (1) failure to protect (§ 300, subd. (b)) in that she has a substance abuse problem, mental health issues and an extensive criminal history that negatively impact her ability to care for the child, she engages in domestic violence, and she did not seek appropriate medical care for the child at birth or since that time; (2) no provision for support (§ 300, subd. (g)) in that she was incarcerated and was unable to make arrangements for the child's care; and (3) abuse of sibling (§ 300, subd. (j)) in that the child's two siblings were currently dependents of the juvenile court for failure to protect.

On May 22, 2013, the juvenile court ordered the child detained.

*Jurisdiction and Disposition—September 2013*

In the report prepared for the jurisdiction and disposition hearing and filed on June 10, 2013, CFS asked that the allegations under subdivision (g)—no provision for support—be dismissed because mother was no longer in custody. CFS asked for reunification services for mother, but that they be denied for the child's father.

On July 17, 2013, CFS filed a form CFS 6.7 "Additional Information to the Court," in which it described mother's visit with the child and her siblings. Mother inappropriately attempted to discuss the case with the children, including telling the infant child that she had been "stolen" from mother "for no reason." When requested to

---

[2] All section references are to the Welfare and Institutions Code unless otherwise indicated.

redirect her comments, mother escalated and the visit was terminated. Mother initially grabbed the children and said "you are not taking them" before eventually allowing the children to leave. Security had to escort mother out of the building and police were called, but they arrived after mother left.

On September 11, 2013, CFS filed another form CFS 6.7. CFS changed its recommendation to reunification services for the child's father, but no reunification services for mother. The change regarding mother was caused by the CFS recommendation that services for the siblings be terminated because of mother's lack of progress in the reunification plan for the siblings. CFS also asked that mother's visits with the child be halted because of mother's erratic and threatening behavior in conjunction with the visits, which on one occasion resulted in police responding and mother being put on a psychiatric hold.

Just before the child's jurisdiction and disposition hearing on September 11, 2013, the juvenile court held the section 366.22 hearing for the child's siblings. After hearing argument from all parties, the court terminated mother's reunification services regarding the child's siblings and set a section 366.26 permanent plan hearing for January 9, 2014.

The court then proceeded immediately to the jurisdiction and disposition hearing for the child. After hearing argument from each party, the court found true the allegations in the section 300 petition regarding failure to protect (subd. (b)) and abuse of sibling (subd. (j)). At the motion of CFS, the court dismissed the allegations that mother had made no provision for support of the child (subd. (g)). Regarding disposition, the court offered father six months of reunification services. The court did not offer

5

reunification services to mother under section 361.5, subdivision (b)(10) because mother had failed to reunify with the siblings. The court also offered mother no visits with the child because of her history of threatening the foster family.

This appeal followed.

**DISCUSSION**

1. *Substantial Evidence of Jurisdictional Findings*

Mother argues substantial evidence does not support the court's findings of jurisdiction over the child, either under subdivision (b)—failure to protect—or subdivision (j)—abuse of sibling.

The petitioner in a dependency proceeding must prove by a preponderance of evidence that the child who is the subject of the petition comes under the juvenile court's jurisdiction. (*In re Shelley J.* (1998) 68 Cal.App.4th 322, 329, superseded by statute on other grounds as stated in *In re Christopher C.* (2010) 182 Cal.App.4th 73, 82.) We review jurisdictional findings under the substantial evidence standard. (*In re E.B.* (2010) 184 Cal.App.4th 568, 574; *In re A.S.* (2011) 202 Cal.App.4th 237, 244.) Under this standard, we determine whether there is any substantial evidence, contradicted or uncontradicted, which supports the conclusion of the trier of fact. (*In re Tracy Z.* (1987) 195 Cal.App.3d 107, 113.) All evidentiary conflicts are resolved in favor of the respondent, and where more than one inference can reasonably be deduced from the facts, we cannot substitute our own deductions for those of the trier of fact. (*In re John V.* (1992) 5 Cal.App.4th 1201, 1212.)

To acquire jurisdiction under subdivision (b) of section 300, the juvenile court was obliged to find that the child "has suffered, or there is a substantial risk that [he] will suffer, serious physical harm or illness, as a result" of specified forms of parental neglect, including substance abuse, physical abuse, and failure to protect the child. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1394.) Here, the juvenile court made findings against Mother that the child was placed at a substantial risk of harm by Mother because her substance abuse problem, mental health issues, and extensive criminal history negatively impact her ability to care for the child, because she engages in domestic violence, and because she did not seek appropriate medical care for the child at birth or since that time. We focus on the evidence of mother's mental health issues that negatively impact her ability to care for the child, because the record is replete with instances supporting the juvenile court's jurisdictional findings.

Mother specifically argues that the record contains no evidence that the child was harmed or at risk of harm in mother's care because of any mental illness. We agree that the child was not actually harmed during the month in which she was in mother's care, but conclude that mother's undiagnosed and untreated mental health issues did put the child at risk of harm, and therefore substantial evidence supports the juvenile court's jurisdictional findings. For example, after an interview with the social worker on June 3, 2013, mother confronted a supervisor in the parking lot of the CFS building. Mother "became verbally aggressive to the point of running up to a supervisor outside of the CFS building screaming and calling the supervisor a "'fucking bitch.'" After screaming at the supervisor . . . the mother proceeded to run back over to her significant other and

physically assault him." The social worker also reported that mother has a history of threatening to kill CFS workers, service providers, and foster parents. On March 26, 2013, sheriff's deputies were called when mother threatened staff at a reunification services provider. Mother said she was going to "'blow up Lutheran Social Services, DOVES [a women's shelter], and Child Protective Services.'" The mother also threatened to kill the foster parents who were caring for the child's siblings. This led the social worker to conclude in the jurisdiction/disposition report of June 12, 2013 that "The mother's behavior is concerning and serve[s] a potential risk to [the child]."

In addition, mother's erratic and aggressive behavior caused the social worker to file the form 6.7 "Additional Information to the Court" on September 11, 2013, mentioned above, in which it recommended that mere visitation with mother be found detrimental "due to the mother's erratic behavior before, during and after visitation. Since the last hearing, there have been several incidents including the mother threatening to use violence such as getting an assault rifle and holding people hostage if she does not regain custody of her children. This incident led to the police responding and the mother to be placed in a psychiatric hold. During visitations the mother often makes inappropriate comments which lead to her behavior escalating when she is asked to cease commenting on the case in the children's presence."

We also note that mother had a substantiated report of emotional abuse regarding the child's oldest sibling in 2009, further negating her argument that any mental health issues are not likely to impact the child directly.

These facts together constitute substantial evidence to support the juvenile court's jurisdictional findings that the child was at risk of harm in mother's care because of her mental illness.

## 2. Denial of Reunification Services

Mother argues the court erred in denying her reunification services, in that: (1) substantial evidence does not support the court's conclusion that mother failed to make reasonable efforts to alleviate the risk under section 361.5, subdivision (b)(10); and (2) regardless of whether mother made reasonable efforts, it was in the child's best interest to offer mother reunification services under section 361.5, subdivision (c).

"There is a presumption in dependency cases that parents will receive reunification services. [Citation.] Section 361.5, subdivision (a) directs the juvenile court to order services *whenever* a child is removed from the custody of his or her parent *unless* the case is within the enumerated exceptions in section 361.5 subdivision (b). [Citation.] Section 361.5, subdivision (b) is a legislative acknowledgement 'that it may be fruitless to provide reunification services under certain circumstances.' [Citation.]" (*Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 95-96 (*Cheryl P.*); see also *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 744 (*Renee J.*), superseded by statute on other grounds as stated in *In re Angelique C.* (2003) 113 Cal.App.4th 509, 518, & *In re Allison J.* (2010) 190 Cal.App.4th 1106, 1113; *In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478.) "Once it is determined one of the situations outlined in subdivision (b) applies, the general rule favoring reunification is replaced by a legislative

assumption that offering services would be an unwise use of governmental resources. [Citation.]" (*In re Baby Boy H.*, at p. 478.)

Section 361.5, subdivision (b), lists the circumstances where reunification services need not be provided. As relevant here, the circumstances include where the juvenile court previously has terminated reunification services for a sibling or half sibling (§ 361.5, subd. (b)(10)).

We review the juvenile court's order denying reunification services under section 361.5, subdivision (b), for substantial evidence. (*Cheryl P.*, *supra*, 139 Cal.App.4th at p. 96.) When determining whether substantial evidence is present, we do not resolve conflicts in the evidence, pass on the credibility of witnesses, or determine where the preponderance of the evidence lies. (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.) We merely determine if there is any substantial evidence, contradicted or not, which will support the conclusion of the trier of fact. (*Ibid*.) Substantial evidence is reasonable, credible evidence of solid value such that a reasonable trier of fact could make the findings challenged. (*In re Brian M.* (2000) 82 Cal.App.4th 1398, 1401.) The burden is on the petitioner to show the evidence is insufficient to support the juvenile court's findings. (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420.)

Section 361.5, subdivision (b)(10), allows a court to deny services if it finds, by clear and convincing evidence "[t]hat the court ordered termination of reunification services for any siblings or half siblings of the child because the parent or guardian failed to reunify with the sibling or half sibling after the sibling or half sibling had been removed from that parent or guardian pursuant to Section 361 and that parent or guardian

10

is the same parent or guardian . . . and that, according to the findings of the court, this parent or guardian has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent or guardian."

A final opportunity for reunification services is provided in section 361.5, subdivision (c), which allows the juvenile court to order services even where bypass is otherwise warranted, if doing so is in the child's best interest. Subdivision (c) thus states, in relevant part: "The court shall not order reunification for a parent or guardian described in paragraph . . . (10) . . . of subdivision (b) unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5, subd. (c).) "The burden is on the parent to change that assumption and show that reunification would serve the best interests of the child." (*In re William B.* (2008) 163 Cal.App.4th 1220, 1227.)

Section 361.5, subdivision (b)(10), contemplates a two-prong inquiry: (1) whether the parent previously failed to reunify with the dependent child's sibling or half sibling; and (2) whether the parent "subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling . . . ." (§ 361.5, subd. (b)(10).) Mother disputes only the second prong here. That "clause in the statute provides a means of mitigating an otherwise harsh rule that would allow the court to deny services simply on a finding that services had been terminated as to an earlier child when the parent had in fact, in the meantime, worked toward correcting the underlying problems." (*In re Harmony B.* (2005) 125 Cal.App.4th 831, 842 [Fourth Dist., Div. Two].)

11

In applying that part of the statute, case law instructs, "the 'reasonable effort to treat' standard" of subdivision (b)(10) "is not synonymous with 'cure.'" (*Renee J.*, *supra*, 96 Cal.App.4th at p. 1464.) Thus, for example, the "mere fact that [Mother] had not entirely abolished her drug problem would not preclude the court from determining that she had made reasonable efforts to treat it." (*Ibid*.) Rather, the statute provides a "'parent who has worked toward correcting his or her problems an opportunity to have that fact taken into consideration in subsequent proceedings.' [Citation.]" (*K.C. v. Superior Court* (2010) 182 Cal.App.4th 1388, 1393.) According to the court in *Cheryl P.*, the focus is on effort, not progress: the provision is meant "to ensure that lackadaisical or half-hearted efforts would not be deemed adequate rather than to additionally require a certain level of progress." (*Cheryl P.*, *supra*, 139 Cal.App.4th at p. 99.)

A.  <u>Substantial Evidence that Mother Did Not Make Reasonable Efforts</u>

Here, mother first contends substantial evidence does not support the juvenile court's conclusion that mother failed to make reasonable efforts to alleviate the conditions that caused CPS to remove the child's siblings from her care in 2012. The child's siblings were detained in January of 2012 because mother was incarcerated on assault and domestic violence charges and failed to make an appropriate plan for their care. Mother left the siblings with her homeless and mentally ill mother, who caused the siblings to be neglected.

Although mother did participate somewhat in reunification services, she did not complete her case plan or complete a psychiatric evaluation  and continued the behavior

12

that was the cause of the sibling's dependency—aggressive and violent criminal behavior that resulted in her being incarcerated and unable to make an appropriate plan for her children. For example, in May 2013, when this child was initially detained, deputies told the responding social worker that mother was known to law enforcement from previous arrests for violent offenses, and that she was often aggressive and combative. On June 3, 2013, as described above, mother was verbally aggressive with a CFS supervisor and then ran over to her significant other and physically assaulted him. More recently, mother continued this behavior in "several incidents," as described above, "before, during and after visitation" by threatening violence if she does not regain custody of her children. The last incident led to a police response and to mother being placed on a psychiatric hold. In fact, mother was again incarcerated at the time of the challenged orders.

Based on these numerous incidents, and despite mother's participation in portions of her case plan, we cannot say that mother made reasonable efforts to alleviate the conditions—mother's aggressive and violent criminal behavior resulting from mental illness and resulting in her inability to care for the children—that caused CPS to remove the child's siblings from her in 2012.

B. The Child's Best Interests Under Section 361.5, Subdivision (c).

Mother argues that the court should have exercised its discretion to find that reunification services would be in the child's best interest because the juvenile court offered reunification services to the child's father and giving mother a similar opportunity to reunify would not delay the child's permanency.

13

However, although it was mother's burden to establish that it would be in the child's best interest to offer her reunification services despite the court's findings under subdivision (b)(10), she provided no evidence on this point and the record does not indicate that it would have been in the child's best interest. Even though offering services to mother would not delay the proceedings, the record does not establish that the juvenile court exceeded the bounds of reason when it denied services. First, mother had already received about 18 months of services for the child's siblings, had not completed the case plan and had made minimal if any progress in curtailing her combative and violent behavior, as described above. Second, mother's irrational behavior often took place before, during and after visits, and mother was often inappropriate *with the child and her siblings* during visits. Third, mother's behavior in conjunction with visits led CFS to ask that mother's visits with the child be discontinued altogether because mother's behavior made the visits detrimental to the child. Fourth, the child was removed from mother as an infant, and there is no indication in the record of a significant mother-child bond that would make it in the child's best interest to continue visits and reunification services despite mother's previous failure to curtail her aggressive and criminal behavior. For these reasons, mother has not established that the juvenile court abused its discretion when it found reunification services to mother would not be in the child's best interest.

3. *ICWA*

Mother argues CFS failed to give adequate notice under the ICWA because the notice omitted the maternal grandmother's tribal affiliation, her correct legal name, and

14

several aliases. As discussed below, we find no prejudicial error. This is because: (1) grandmother did not provide any information regarding her tribal affiliation; and (2) it appears from the record that the child's Native American heritage derives from her maternal grandfather, and so any error in not providing the noticed tribes with each of the maternal grandmother's possible legal names and aliases was harmless.

The ICWA was enacted "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families . . . ." (25 U.S.C.A. § 1902.) "The ICWA presumes it is in the best interests of the child to retain tribal ties and cultural heritage and in the interest of the tribe to preserve its future generations . . . ." (*In re Desiree F.* (2000) 83 Cal.App.4th 460, 469.) To this end, section 1911 of the U.S.C.A. allows a tribe to intervene in state court dependency proceedings. (25 U.S.C.A. § 1911(c).)

Notice of the proceedings is required to be sent whenever it is known or there is reason to know that an Indian child is involved. (25 U.S.C.A. § 1912(a); Welf. & Inst. Code, § 224.2, subd. (a); see *In re Desiree F.*, *supra*, 83 Cal.App.4th at p. 469.) Notice serves a twofold purpose: "(1) it enables the tribe to investigate and determine whether the minor is an Indian child; and (2) it advises the tribe of the pending proceedings and its right to intervene or assume tribal jurisdiction." (*Id.* at p. 470.)

In addition to the child's name and date and place of birth, if known, the notice is required to include the "name of the Indian tribe in which the child is a member or may be eligible for membership, if known." (§ 224.2, subd. (a)(5)(B).) The notice is also required to contain "[a]ll names known of the Indian child's biological parents,

15

grandparents, and great-grandparents, . . . as well as their current and former addresses, birthdates, places of birth and death, tribal enrollment numbers, and any other identifying information, if known." (§ 224.2, subd. (a)(5)(C); see also 25 C.F.R. § 23.11.)

Juvenile courts and child protective agencies have "'an affirmative and continuing duty'" to inquire whether a dependent child is or may be an Indian child. (*In re H.B.* (2008) 161 Cal.App.4th 115, 121; § 224.3; Cal. Rules of Court, rule 5.481.) As soon as practicable, the social worker is required to interview the child's parents, extended family members, the Indian custodian, if any, and any other person who can reasonably be expected to have information concerning the child's membership status or eligibility. (§ 224.3, subd. (c); *In re Shane G.* (2008) 166 Cal.App.4th 1532, 1539; Cal. Rules of Court, rule 5.481(a)(4).) "Notice is meaningless if no information or insufficient information is presented to the tribe." (*In re S.M.* (2004) 118 Cal.App.4th 1108, 1116.) "The juvenile court must determine whether proper notice was given under ICWA and whether ICWA applies to the proceedings. [Citation.] We review the trial court's findings for substantial evidence. [Citation.]" (*In re E.W.* (2009) 170 Cal.App.4th 396, 403-404.)

Here, the form ICWA-010(A) "Indian Child Inquiry Attachment" for the child, dated May 20, 2013, the box is checked indicating the child "is or may be a member of or eligible for membership in a tribe" and the name of the tribe typed in is "Cherokee." The detention report, also dated May 20, 2013, states that "The Indian Child Welfare Act does or may apply" and lists the tribe as "Cherokee." The detention report also states "[mother] stated that she does have Native American ancestry and claimed the Cherokee

16

tribe from Oklahoma." On May 22, 2013, mother completed the form ICWA-020 "Parental Notification of Indian Status," on which she checked the box next to "I may have Indian ancestry" and handwrote the name of the tribe as "Cherokee." At the detention hearing held on May 22, 2013, mother identified "Cherokee" as her Native American heritage and, when asked whether "there is any other tribe other than Cherokee", she replied "Not for this child, no. Not that I know of." We note that mother gave the name of her father, not her mother, as a person to whom the social worker could inquire regarding the child's Indian ancestry. On June 13, 2013, the child's father filed a form ICW2A-020 with the court indicating he had no Indian ancestry. This is substantial evidence that any Indian ancestry for the child would be through the maternal grandfather rather than maternal grandmother.

On July 15, 2013, the court filed a form ICWA-030 "Notice of Child Custody Proceeding for Indian Child" that was dated June 19, 2013. The notice was sent to the child's father, the Cherokee Nation, the Eastern Band of Cherokee Indians, the United Keetoowah Band of Cherokee, the Sacramento Bureau of Indian Affairs, and the Secretary of the Interior. Each of the three tribes responded that the child was not an Indian child.

Under "Tribe or band, and location" for maternal grandmother, the ICWA notice says "No information available." Although mother asserts that maternal grandmother had claimed Cherokee heritage and that this information was in the possession of CFS, we agree with CFS that no such claim by grandmother regarding her own heritage appears in the record. Therefore, CFS did not err in this respect.

17

Mother also argues the notice was deficient regarding the maternal grandmother's information because it gave an incorrect legal name, and omitted "the names she was known as." "Both the federal regulation and section 224.2, subdivision (a), require the social services agency to provide as much information as is known concerning the child's direct lineal ancestors . . . including maiden, married former names or aliases . . . . [Citation.]" (*In re Cheyanne F.* (2008) 164 Cal.App.4th 571, 575, fn. 3.) The notice listed the maternal grandmother's name as "Christine Knight." In the status review report dated June 7, 2013, the maternal grandmother's name is listed as "Christine Knight (AKA: Ann Masley, Christing Sandra Knight, Julie Christine Masley, and Ann Julie Masley." This is taken from the February 14, 2012 Jurisdiction/Disposition report from Los Angeles County regarding the dependency of the child's two siblings.[3] The Los Angeles County detention report dated 1/20/2012, says "On 01-17-12, CSW met with MGM who identified herself as Christine Knight but stated that her legal name is Sandra Christine Knight" and then lists the aliases listed above. On another page identifying the maternal grandmother as the person from whom the siblings were removed, the report shows her name as "Ann Julian Masley." At the detention hearing on May 22, 2013, mother's counsel identified the maternal grandmother as "Christine Knight." At the hearing held on September 11, 2013, the maternal grandmother identified herself to the court in the following manner: "Kristy Knight, my legal name is Kristy Knight (phonetic

---

[3] The record in this appeal does not contain the February 14, 2012 Jurisdiction/Disposition report from Los Angeles County. The record does contain the January 20, 2012 detention report and an addendum.

18

spelling)." Because CFS did not include all known iterations of the maternal grandmother's name, including several aliases and two potential legal names, the notice was deficient under 25 Code of Federal Regulations, section 23.11, subdivision (d)(3). However, we agree with CFS that this error was harmless because the record indicates any Native American heritage was through the maternal grandfather, not the maternal grandmother. Under *In re Cheyanne F., supra,* 164 Cal.App.4th 571, 576-577, omission of information about non-Indian relatives is not necessarily prejudicial, unless such information about the non-Indian relatives is relevant to a tribe's determination regarding the child's eligibility. We see no such indication here that such information is relevant to determining the child's eligibility for tribal membership, and so find the omission to be harmless. Mother has failed to establish prejudicial error.

## DISPOSITION

The juvenile court's orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

MILLER
J.

RICHLI
J.

19